UNITED STATES DISTRCIT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BENJAMIN CAREATHERS, individually, and on behalf of all others similarly situated, | 1:13-CV-0369 (KPF) |
| Plaintiff, | |
| - against - | Date: May 1, 2015 |
| | Time: 10:00 a.m. |
| RED BULL NORTH AMERICA, INC., A California corporation A California corporation a California corporation, Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DAVID WOLF and MIGUEL ALMARAZ, individually and on behalf of others similarly situated,

    Plaintiff,

     v.

RED BULL GMBH, a foreign company;
RED BULL NORTH AMERICA, INC.,
a California corporation; and
RED BULL DISTRIBUTION
COMPANY, INC.,
a Delaware corporation,

    Defendants.

---

## PARTIAL OBJECTION OF PATRICK CRUZ AND RUBEN QUINONES AND NOTICE OF INTENT TO APPEAR

---

Quyen C. Hoang, (Pro Hoc Vice, Pending)
Law Office of Quyen C. Hoang
17011 Beach Blvd., Suite 900
Huntington Beach, CA 92647

Attorney for Objectors Patrick Cruz and
Ruben Quinones

## TABLE OF CONTENTS

INTRODUCTION.   .   .   .   .   .   .   .   .   7

STATEMENT OF FACTS.   .   .   .   .   .   .   .   9

ARGUMENTS.   .   .   .   .   .   .   .   .   15

    A.  THE SETTLEMENT TREATS THE CASH SUBCLASS UNFAIRLY
      BY FORCING MEMBERS THEREIN TO PAY ALL COSTS AND
      EXPENSES OF SETTLEMENT INCLUDING THOSE OF THE
      PRODUCT OPTION SUBCLASS.   .   .   .   .   .   15

    B.  THE PRODUCT SUB CLASS SETTLEMENT IS UNFAIR AND
      INADEQUATE BECAUSE OF THE USE OF MSRP.   .   .   16

    C.  THE USE OF MSRP AS A BENCHMARK IS ESPECIALLY UNFAIR
      AND INADEQUATE IN LIGHT OF THE FACT THAT DEFENDANT
      ROUTINELY OFFERS THEIR PRODUCT FREE OF CHARGE. .   19

    D.  THE PRODUCT SUB-CLASS WAS PREJUDICED BECAUSE IT
      WAS INADEQUATELY NOTICED OF THE USE OF MSRP AS A
      BENCHMARK.   .   .   .   .   .   .   .   20

    E.  "USE TAXES" AND UNFAIRNESS TO THE CASH SUB CLASS.   21

    F.  UNFAIRNESS TO CHARGE THE CASH SUB CLASS  THE
      RECYCLING FEE ON CANS OF PRODUCT ENJOYED SOLELY BY
      MEMBERS OF THE PRODUCT SUB CLASS.   .   .   .   23

    G.   THE INHERENT UNFAIRNESS TO THE CASH SUB GROUP
    ARGUES AGAINST APPROVAL OF THE SETTLEMENT AS
    THE NAMED PLAINTIFFS DO NOT ADEQUATELY REPRESENT
    THE INTEREST OF THE ENTIRE CLASS.   .   .   .   .   25

    H.  THE ATTORNEYS FEES ARE UNFAIR AND UNREASONABLE
      BECAUSE THEY ARE EXCESSIVE.   .   .   .   .   27

I.   THE ATTORNEYS FEES FOR THE CALIFORNIA ACTION ARE
     EXCESSIVE BECAUSE THEY ARE DUPLICATIVE.   .         .         . 33

J.   ANY REDUCTIONS IN ATTORNEYS FEES SHOULD
     REVERT TO THE COMMON FUND FOR THE BENEFIT
     OF THE CLASS.   .         .         .         .         .         .         .         . 34


K.   THE VALUE OF THE INJUNCTIVE RELIEF AS SET FORTH IN THE
     SETTLEMENT IS ILLUSORY.   .         .         .         .         .         . 36

L.   THIS COURT SHOULD USE A STRIKE PRICE OF $1.00 INSTEAD
     OF M.S.R.P. TO DETERMINE THE AMOUNT OF PRODUCT
     AVAILABLE TO THE PRODUCT SUB CLASS.   .         .         .         . 36


M. INCENTIVE AWARDS TO PLAINTIFFS. .         .         .         .         . 37

IV   CONCLUSION.         .         .         .         .         .         .         .         . 38

TABLE OF AUTHORITIES

*Alltrade, Inc. v. Uniweld Products, Inc.,*

946 F.2d 622, 625 (9th Cir. 1991) . . . . . . . . .29, 30

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) . . . . 11

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).. . . 12, 27

*Farinella v. PayPal,* 611 F.Supp.2d 250 (E.D.N.Y.2009) (Glasser J.) . . . 27

*Goldberger v. Integrated Res., Inc.,* 209 F.3d 43 (2d Cir. 2000). . . . 13, 25, 27

*In Re Agent Orange Product Liability Litigation,*

818 F2d 226, 236 (2d Cir. 1987). . . . . . . . 27

*In re Gilat Satellite Networks, Ltd.,*

No. 02 Civ. 1510, 2007 WL 2743675, at *16 n.41 (E.D.N.Y. Sept. 18, 2007). . 27

*In re Literary Works in Electronic Databases Copyright Litigation,*. . . 22

*Johnston v. Comerica Mortg. Corp.,* 83 F. 3d 241 (8th Circuit 1996),. . . 31

*McCain v. Rahal Letterman Racing, LLC,*

No. 07-cv-5729 (JSR), 2007 WL 2435170, at *2 (S.D.N.Y. Aug. 27, 2007).. . 30

*Parker v. Time Warner Entertainment Co., LP,*

631 F. Supp. 2d 242, 269 (E.D.N.Y 2009). . . . . . . 31

*Wallace Berrie & Co. v. State Bd. of Equalization (1985)*

40 Cal.3d 60, 66-67. . . . . . . . . . 18

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 U.S. 96, 116-117. . . . 12, 17, 25

Cal.Code Regs., tit. 18, § 1670.. . . . . . . . . 18

California Sales and Use Tax Law (Rev. & Tax.Code, § 6001 et seq.). . . 18

Fed. R. Civ. P. 23(a).. . . . . . . . . . 21

MEMORANDUM OF POINTS AND AUTHORITIES

Patrick Cruz and Ruben Quinones (collectively, "Objectors"), whose names, address and contact information are known to all parties hereto by way of the claims administrator. Alternatively, said information are that of their attorney of record herein. Said Objectors by their undersigned counsel, respectfully submit this partial Objection to the proposed settlement (the "settlement") of the instant action.

## INTRODUCTION

The instant Objection acknowledges the efforts and skill of class counsel and does not seek to overturn the settlement amount of $13,000,000 negotiated in good faith by class counsel and defendants herein. However, as currently structured the allocation and distribution scheme as well as the requested attorney's fees and incentive award in the proposed settlement makes it unfair, unreasonable and inadequate.

Firstly, the settlement agreement divides the class into two sub classes depending on whether the class member chooses a cash option of about $10.00 or a product option with a $15.00 retail value. At first blush this seems reasonable but as with everything else, the devil is in the details. In this instance, the settlement is unfair in that it unfairly discriminates amongst the sub-classes. Specifically including but not limited to the fact that all "costs of notice and claims administration and any necessary taxes and tax expenses" shall be drawn solely from the Cash sub class. Thusly, in this instant, the product option class gets to enjoy their benefit with the cash option class paying all the expenses.

7

Second, the class was unfairly required to choose between a cash option and a product option without sufficient information to decide which is the better option. For example the notice to class provided a product option with a "...retail value of $15.00" but fails to define what that means. It is only upon careful review of the Stipulation for Settlement, Paragraph 25 that it is revealed that "retail value" is actually the Manufacturer's Suggested Retail Price (MSRP). As revealed herein the "retail price" is often significantly less than the "MSRP", this discrepancy in terms is significant in that it is THE key metric in determining how much product is allocated. The fact that the class was not provided sufficient information regarding the use of MSRP is amply demonstrated by the fact that Class Counsel and Defendant Red Bull (the very parties pushing this settlement) do NOT even now what the MSRP value presently is![1]

Third, the product option is basically a sugary carbonated beverage in an aluminum can which creates a host of problems that needs to be sufficiently addressed. Most notably is the 5-10 cent per can recycling fee/deposit in the numerous states that have such recycling programs such as California and New York. Additional complexity arises in the differing ways in which each state implements its recycling program. For example, in California it is referred to as a California Redemption Value "CRV" which is treated as a "Regulatory Fee" on applicable product purchases. However, in numerous other states such as New York, it is treated as a Deposit which must be paid prior to distribution. In the present case the applicable scenario would have either defendant Red Bull pay the 5 cents per can or presumably charge said cost to the Cash sub class before distribution. As these charges are treated either as "fees" or

---

[1] Paragraph 25 of the Stipulation for Settlement states that retail value "means the Manufacturer's Suggested Retail Price as of the date of delivery of the ... products distributed in fulfillment of the Product Option to valid Claimants." This MSRP determination at a later date pre-supposes that no one knows what the MSRP is or will be.

8

"Deposits", significant complications arises that will be detailed further below.  By way of example, the Notice to Class Members provided notice that "taxes" arising from the settlement will be paid out from the "Cash Option" sub class, however, in many states such as New York, the 5 cents per can recycling fee is treated as a "refundable deposit" rather than a tax.  Thus, if defendant Red Bull plans to charge the Cash Sub class for the 5 cent per can recycling fee in New York, this would be impermissible as the Class Members where never provided notice that they would bear the cost to fund Defendant Red Bull's recycling deposit in states such as New York.[2]

Fourth, the attorney's fees and incentive awards requested are excessive and are thus unfair to the class.  An additional objection is related is the reversionary nature of said fees, i.e. any such fees requested by class counsel NOT awarded will be refunded to the Defendants herein.

It is NOT the goal of Objectors herein to derail the settlement but rather, to prevail upon this Honorable court to modify the proposed settlement agreement as set forth below and based thereon grant approval accordingly.

## II.     STATEMENT OF FACTS.

The following are pertinent facts as set forth in the Joint Motion for Preliminary Approval with emphasis added:

Red Bull manufactures, markets and sells the popular line of Red Bull energy drinks, which was introduced into the United States in 1996-97.  The energy drinks marketed under the Red

---

[2] The settlement envisions millions of cans of product and consequently these recycling 5 cent "fees" and "deposits" can be as high as $182,000 or more as set forth in further detail herein.

Bull brand include Red Bull® Energy Drink, Red Bull® Sugar free, Red Bull® Total Zero and Red Bull® Editions. The drinks have been extremely popular — since its launch here, over four billion units have been sold in the United States.

On January 16, 2013, Plaintiff Careathers, a longtime consumer of Red Bull beverages, commenced the instant putative class action, alleging that Red Bull labeling and marketing has deceived consumers. On April 1, 2013, Plaintiff Careathers served an amended complaint to address various objections by defendants. Pursuant to stipulations between the parties, and to advance mediation sessions and settlement discussions, the deadline for Red Bull to respond to the Amended Complaint was extended to September 30, 2013.

The gravamen of the Careathers complaint is that the functional benefits of consuming Red Bull are not superior to the benefits from ingesting an equivalent amount of alternate sources of caffeine, and that consumers have been misled by Red Bull advertising to believe the drink is a superior source of energy beyond caffeine. As a result, Plaintiff Careathers alleges Red Bull has induced consumers into purchasing and/or paying a price "premium" for its beverages. Plaintiffs therefore seek certification of a nationwide class of Red Bull consumers. Plaintiff Careathers alleges causes of action for breach of express warranty (Count I), unjust enrichment (Count II), violations of New York Deceptive Acts and Practices Act , N.Y. Gen. Bus. Law §§ 349 and 350 (Count III), and violation of the consumer protection acts of 40 other states (Count IV). Plaintiff Careathers seeks both monetary and injunctive relief, including restitution and disgorgement of all profits, benefits and other compensation.

On February 27, 2013, Plaintiffs Wolf and Almaraz filed their class action complaint in the Central District of California, under the caption Wolf v. Red Bull GmbH, et al., No. cv 1301444 (C.D. Cal.). **The California plaintiffs make similar allegations** of deceptive conduct

arising out of the same alleged marketing representations by Red Bull. **Like Careathers, the California plaintiffs seek to represent a nationwide class of Red Bull consumers and** demand monetary and injunctive relief, and **assert claims for unjust enrichment and violations of California consumer protection statutes (just as Plaintiff Careathers does).** The California case was subsequently consolidated (on the consent of all parties) with the New York Action before this Court.

B. Settlement Negotiations and Mediation

**Plaintiff Careathers and Red Bull began to discuss the possibility of a settlement shortly after the filing of the Careathers Amended Complaint. On April 9, 2013,** counsel met in person at Plaintiff Careathers's counsel's New York office to discuss the parties' relative positions and start to consider a framework of a resolution of the lawsuit that would be both mutually acceptable and present a favorable disposition to the putative class(es) that Plaintiff Careathers purports to represent. Counsel met once again in person at counsel's offices on April 15. Subsequent to that meeting, an effort was made by Red Bull to ensure that the Plaintiffs and counsel in the California action were also fully involved and fairly represented in settlement negotiations. After further conversations between counsel for Red Bull and counsel for Plaintiffs in both cases, **all parties engaged in three-way mediation in Los Angeles, California on June 24, 2013, and in New York on July 12, 2013, before mediator Hon. Peter D. Lichtman (Ret.). After more than 12 hours of mediation, the parties reached agreement on a "mediator's proposal" presented by Judge Lichtman, the terms of which are memorialized in the Stipulation.**

Attorneys' fees and expenses, as well as class representative incentive awards, were negotiated separate and apart, and following, negotiation of the settlement relief provided to the nationwide Settlement Class.

TERMS OF THE PROPOSED SETTLEMENT

The settlement relief includes cash payments, direct-distributed free products, non-monetary injunctive relief, and, under certain limited circumstances, a potential small contribution to a charity as a cy pres remedy.  The Stipulation also provides for payment of Plaintiffs' attorneys' fees and expenses, releases, the parameters of the class notice program, and payment of the costs of notice and claims administration.  In total, the value of the settlement distributions is $13 million, not including the value of the non-monetary injunctive relief, and the attorneys' fees and Class Representative incentive awards.  The total collective value of all cash and product distributions by Red Bull to Class Members (not including notice and tax expenses) will be $13 million, divided into a $6,500,000 Cash fund for those requesting a cash settlement and a $6,500,000 dollars in RETAIL value or Red Bull product for those electing a free product settlement.

The Cash Fund will be first applied to pay in full and in order the costs of notice and claims administration and any necessary taxes and tax expenses.   Accordingly, cash payments to Class Members shall be made from the balance of the Cash Fund remaining after these initial payments are made (the "Net Settlement Balance").

Settlement Class Members who opt for the cash reimbursement option and submit a valid and timely Claim Form, with no receipt necessary, will receive a $10.00 cash reimbursement for any and all Red Bull products purchased during the Settlement Class Period. (Id. § IV.A.3(a).)

A Settlement Class Member choosing the Product Option shall receive free Red Bull Products (either Red Bull® Energy Drink or Red Bull® Sugarfree, as selected by the Class Member on the Claim Form) with an approximate retail value of $15.00. Product packaging (e.g., a four-pack) and sizing (e.g., 8.4 ounce cans) shall be determined by Red Bull at its discretion after the final value of the Product Option has been determined. The free Red Bull products selected on the Claim Form will be shipped by Red Bull directly to class members at Red Bull's cost. (Id. § IV.A.4(a).) Red Bull will ship the products to the Claimant selecting the Product Option at the addresses provided by the Class Action Settlement Administrator. (Id. §§ IV.A.4(b), A.11(b).)

The full amount of the $13 million Distribution Fund will be distributed to Class Members as cash reimbursements or products to fulfill the Product Option, save for notice and tax expenses (and a very limited potential cy pres remedy, discussed below). The initial Cash Fund of $6.5 million may be supplemented if necessary to ensure that full $10.00 cash reimbursements are paid to all valid Claimants, provided that the aggregate value of all valid cash and products to fulfill the Product Option claims does not exceed the $13 million. As previously stated, the attorneys' fees and representative plaintiff incentive awards shall be rendered separate and apart from the guaranteed Cash Settlement Fund.

Similarly, if valid claims for products to fulfill the Product Option exceed $6.5 million and the aggregate value of all claims does not exceed the Distribution Fund (i.e., claims for cash reimbursement do not use up the entire Cash Fund), the Cash Fund may be reduced in the

amount necessary to provide full $15.00 in products to valid claimants choosing the Product Option.  (Id. § IV.A.8(a).)

3. Injunctive Relief

For purposes of the Stipulation, Defendants confirm that all future claims about the functional benefits and safety of its products will be medically and/or scientifically-supported. (Id. § IV.B.3.)


B. Attorneys' Fees and Expenses

Red Bull will not oppose Class Counsel's application for attorneys' fees, costs and expenses in an amount not to exceed a total of $4,750,000.  Class Counsel's application for fees, costs and expenses is based on the total settlement package, which is comprised of the Settlement Fund, the fees and costs that Red Bull is paying separately from the Settlement Fund, plus the value of the injunctive relief that has been obtained.  The amount applied for by Class Counsel will include all costs and fees incurred by Class Counsel in connection with the litigation thus far, as well as ongoing and future costs and fees through finalization of settlement of the action and if necessary, responding to objectors and defending the settlement on appeal.  (Id. § VIII.A.)

Attorneys' fees, costs, and expenses approved by the Court shall be paid by Red Bull separate and apart from the money or value in the Settlement Fund; in other words, any attorneys' fees award will not diminish the money and value being disseminated to the Settlement Class. (Id. § VIII.C.)  Class Counsel will, in their sole discretion, allocate and distribute the Fee and Expenses award in good faith among Class Counsel and additional counsel for any plaintiff in this Litigation; (Id. §§ VIII.B, C.)

C. Class Representative Incentive Awards

14

Red Bull will not oppose Class Counsel's application to the Court for an incentive award to class representatives Benjamin Careathers, David Wolf and Miguel Almaraz in an amount not to exceed $5,000 per representative for their efforts in filing the litigation and participating in the settlement negotiations on behalf of themselves and all others similarly situated.  (Id. § VIII.B.)

As with the attorneys' fees, the incentive awards will be paid separate and apart from the value being distributed to the Settlement Class. (Id. § VIII.C.)

## III.  ARGUMENTS

### A.  THE SETTLEMENT TREATS THE CASH SUBCLASS UNFAIRLY BY FORCING MEMBERS THEREIN TO PAY ALL COSTS AND EXPENSES OF SETTLEMENT INCLUDING THOSE OF THE PRODUCT OPTION SUBCLASS

The proposed $13,000,000 settlement agreement bifurcates an ostensibly unitary bloc of class members into two distinct sub-classes distinguished by the type of benefit they select namely $10.00 Cash (the Cash Sub Class) or Red Bull Product with a retail value of $15.00 (the Product Sub Class).   The Settlement then proceeds to unfairly discriminate between the Cash Sub Class by requiring it to bear the entire cost of settlement related expenses including, "costs of notice and claims administration and any necessary taxes and tax expenses."
[3]  This disparate treatment between the two sub classes puts at risk the instant settlement by

---

[3] There are no public documents that reveals what these "necessary taxes and tax expenses" are or how much they are.  It is presumably a "Use" tax charged on inventory that is used without collection of a sales tax.  Thus the Cash sub class is forced to pay use taxes on product that would be consumed by the Product sub class.   This assumption

creating the necessity to formalize the Cash and Product Sub Class with the attendant need for separate counsel to represent the distinct interest of the two sub groups.  See *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) in which the United States Supreme Court stated:

> Although the named parties alleged a range of complaints, each served generally as representative for the whole, not for a separate constituency.  Where differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups.  The class representatives may well have thought that Settlement serves the aggregate interests of the entire class.  **But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consent given by those who understand that their role is to represent solely the members of their respective subgroups.**  The Thirds Circuit found no assurances here- either in terms of the settlement or in the structure of the negotiations- that the named plaintiffs operated under a proper understanding of their representational responsibilities.  That assessment, we conclude, is on the mark." [Emph. Added.] Amchem, 521 U.S. at 623, 627 (citations omitted).

In the instant case the substantial unfairness of the Cash Sub Class paying all costs and expenses of the Product Sub Class calls into question the ability of the named plaintiff to adequately represent members of the Cash sub group.  See further arguments below.  This inadequacy of representation is established by the simple fact that the named Plaintiffs herein agreed to this unjustifiably one sided allocation of costs and expenses.   As structured, the instant proposed settlement is thusly flawed and should NOT be approved without conditions remedying the unfairness as set forth herein.

## B.  THE PRODUCT SUB CLASS SETTLEMENT IS UNFAIR AND INADEQUATE BECAUSE OF THE USE OF MSRP

The standard for demonstrating that a settlement is sufficiently "fair, adequate,

---

is required as no such information was disclosed either to the class members via the Notice or was it disclosed to all interested parties and most importantly this honorable Court.  This is also another grounds for objection.

and reasonable…" in order to obtain final approval is more exacting, see *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116-117, and includes consideration of the nine Grinnell factors articulated by the Second Circuit: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class; (3) the stage of the proceedings and discovery completed; (4) the risks of establishing liability; (5) the risks of proving damages; (6) the risks of maintaining a class action through trial; (7) the ability of defendants to withstand greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of the attendant risks of litigation. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), abrogated on other grounds, *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43 (2d Cir. 2000).  By any fair measure, there are only two Grinnell factors that stands against final approval,  However, based on the facts set forth herein they are indeed significant.  Specifically, factors 7 the ability of defendants to withstand greater judgment; and factor 8 the range of reasonableness of the settlement fund in light of the best possible recovery are related.  It is beyond dispute that Defendant can afford to pay more than $13,000,000 in general and $6,500,000 in retail value of product in particular.

This unfairness is amply demonstrated by the use of Manufacturer Suggested Retail Price (MSRP) as the benchmark for determining the amount of product available to the product sub class.  The Stipulation for Settlement estimates the present MSRP value of an 8.4 oz. can of Red Bull at about $1.87 per can.[4]  However, retailers routinely sell products below the MSRP.  Specifically, retail price of an 8.4 oz. can of Red Bull at Wal-Mart is about $1.49.  See

---

[4] Stipulation of Settlement estimates that $15.00 of product is equivalent to" approximately two four packs of 8.4 ounce cans of Red Bull…"  See Stipulation for Settlement p. 14, paragraph 4(a).  8 cans / $15.00 = $1.875 per can.

Exhibit 1.   At Costco it is $1.43 See Exhibit 2.  It is $1.28 per can on Amazon.com See Exhibit

3.  It is even lower at $1.23 per can at Costco in a 24 pack with manufacturer's rebate. See

Exhibit 4.

|  | Per Can | Per 4-pack | per $15.00 value |
|---|---|---|---|
| MSRP | $1.875 | $7.50 | (2) 4-packs |
| Wal-Mart Retail | $1.49 | $5.96 | (2) 4-packs, and 2 cans |
| Costco Retail | $1.43 | $5.72 | (2) 4-packs, and 2 ½ cans |
| Amazon Retail Quantity i.e. 5 cases of 24 | $1.28 | $5.12 | (2) 4-packs, and 3 ½ cans |
|  |  |  |  |
| Costco retail with Manufacturer's Rebate | $1.23 | $4.92 | (3) 4-packs |

Table 1

The bottom line is that using MSRP would reduce the amount of product available to the product

sub class.  Taking a look at Table 1 above, $15.00 of purchasing power using the lowest retail

price of $1.23 is equivalent to three 4 packs whereas using MSRP would only yield two 4-packs.

Using MSRP is more unfair and inadequate in light of the actual cost to the manufacturer and to

the settlement class.

| $6.5 million equivalent | Per 8.5 oz. can | Per 4-pack 8.5 oz. can |
|---|---|---|
| MSRP @ $1.875 | 3,466,666.66 | 866,666.66 |
| Mean average of retail prices in Table 1 @ $1.357 | 4,789,977.89 | 1,197494.47 |
| Objectors proposed Value  @ $1.00 | 6,500,000 | 1,625,000 |

| Estimated Manufacturer's Cost @ .61[5] | 10,000,000 | 2,500,000 |
| --- | --- | --- |

Table 2

Table 1 herein reveals that although the $6,500,000 in product value is fair the allocation of product using MSRP does not satisfy Grinnell's factor numbers 7 and 8 namely because Class counsel agreed to the use of MSRP as a benchmark which is significantly higher than the actual retail costs widely available to the public at large.  Table 2 reveals that deviating from the MSRP value would significantly increase the amount of product that is available to the product sub class.  Table 3 below clearly demonstrates why MSRP is unfair and inadequate in light of the Grinnell Factor 8.  This table reveals that the product sub class would still have more product available had Class Counsel asked for Wal-Mart retail price and offered to reduce the Defendants settlement liability by $1million.  If the retail price is fixed on the average of Costco and Amazon pricing, i.e. $1.35, the product sub class would still have more than 54,400 4-packs EVEN if Defendants settlement liability is reduced by $1,500,000 down to $5,000,000!

|  | $6,500,000 | $5,500,000 | $5,000,000 | $4,500,000 |
| --- | --- | --- | --- | --- |
| MSRP @ $1.875 | **866,666** | 733,333 | 666,666 | 600,000 |
| Wal-Mart Retail @ $1.49 | 1,090,604 | **922,818** | 838,926 | 755,033 |
| Mean average of retail price in Table 1, @ $1.357 | 1,197,494 | 1,013,264 | **921,149** | 829,034 |
| Objector proposed value @ $1.00 | 1,625,000 | 1,375,000 | 1,250,000 | **1,125,000** |

---

[5] Red Bull is a private company so its production costs to manufacture one 8.5 oz. can of Red Bull is not publicly available.  The $0.61 number used herein is based on the general rule of thumb in product pricing which is marking up the product at 3 times its' costs.  Thus 33% of $1.875 is $0.61875.  As Red Bull manufactures cans in the Billions their actual costs is likely to be significantly lower.

Table 3
Numbers reflects 4-packs of 8.5 oz. cans

## C.  THE USE OF MSRP AS A BENCHMARK IS ESPECIALLY UNFAIR AND INADEQUATE IN LIGHT OF THE FACT THAT DEFENDANT ROUTINELY OFFERS THEIR PRODUCT FREE OF CHARGE

The use of MSRP reduces the amount of product available to the product sub class. Table 2 above shows that as presently structured there is only 866,666 4-packs available to the class.  If claims exceed this amount, pro-ration is implemented.  The fairness of this settlement is in the implication that the product class may receive 2 four packs of Red Bull.[6] This of course is subject to the amount of claims and possible need for pro ration.  If the product claims exceed 433,333, then the class member cannot receive 2- four packs.  If the claims exceed 866,666 then a four-pack per class member is not possible. If each product sub class member cannot get at least 2- four pack[7], then the use of MSRP is unfair and inadequate to the product sub class as it requires them to waive legal rights in order to receive products that they can essentially get for free directly from Defendant Red Bull online.

Specifically, as of the time of this writing any member can simply go to the Red Bull website and sign up using twitter, provide their name and address and Red Bull will ship a 4-pack directly to them free of charge.  See Exhibit 5.   If all the product sub class can get is a 4-pack or less, there interest would have been best served by simply opting out of the class

---

[6] See Stipulation for Settlement, p. 14, paragraph 4(a), which reads in pertinent parts that the product sub class "will obtain, for example, approximately two four packs of 8.4 ounce cans of Red Bull products."

[7] Red Bull routinely gives away one 4-pack per person.  Thus a settlement that offers more than one 4-pack is a benefit to the class that is NOT offered to the general public for free.

and twittering the Defendant.  In this scenario, the product sub class member would have retained their litigation rights and a guarantee of at least a 4-pack of product without any risk of pro-ration. Additionally, Red Bull would pay the cost of shipping, "use taxes" and recycling deposits.

### D.   THE PRODUCT SUB-CLASS WAS PREJUDICED BECAUSE IT WAS INADEQUATELY NOTICED OF THE USE OF MSRP AS A BENCHMARK.

The Second Circuit has explained that the standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness . . . . [T]he settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.  Notice is adequate if it may be understood by the average class member. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 113-14 (internal quotations and citations omitted).

The relevant parts of the Notice to Class specifically states, that the product option will provide "Free Red Bull products (either Red Bull ® Energy Drink or Red Bull ® Sugarfree, as selected on the Claim Form) with a **retail value** of approximately $15.00." [Emph. Added.] Additionally, in every reference to the value of the product option in the settlement documents and pleadings such as the Motion for Preliminary Approval, Long Form Notice and Publication Notice there is NO reference to the fact that "retail value" is defined as the MSRP.  MSRP is only mentioned **once** on page 10 paragraph 25 of the 36 page Stipulation for Settlement.

As MSRP is substantially higher/different than the actual retail price of several of the largest retailers in the U.S., (see Table 1 above), failing to disclose such a key benchmark is fatal

to the settlement of the product sub class.  The lack of disclosure fails the *Wal-Mart Stores, Inc.* test as it cannot be said that the use of MSRP was "understood by the average class member" when in truth and in fact they were never made aware of it.

### E. "USE TAXES" AND UNFAIRNESS TO THE CASH SUB CLASS

It is not unusual that class members have to pay taxes on settlement Distribution, however what is unusual here is that one sub class is required to pay the taxes of another sub class.  Although the Notice to Class members and Settlement pleadings filed with this Court is silent as to what "taxes and tax expenses" that the Cash Sub Class is required to pay, the tax at issue is most likely a "Use tax".  In Numerous states including California and New York, a "Use Tax" works to substitute for the loss of a "sales tax" in instances where the consumer receives products tax free such as out of state purchases, online purchases or free products.[8]  In California, the appeals Court explained that "[h]owever, unless a use tax is assessed, if the goods are not subsequently resold but disposed of in another manner, the purchaser may well manage to avoid taxation altogether.   Thus, the use tax insures that the basic excise tax will be levied on transactions which might otherwise inequitably escape taxation."  *Wallace Berrie & Co. v. State Bd. of Equalization* (1985) 40 Cal.3d 60, 66-67.   The California Sales and Use Tax Law (Rev. & Tax.Code, § 6001 et seq.) defines "Use" as the

---

[8] New York defines a "Use Tax" as "a tax imposed on taxable items or services used in New York when the sales tax has not been paid. If a sales tax has not been collected by the seller on a taxable sale, or **when taxable items or services are used in New York and the New York sales tax has not been collected, you must report and pay tax directly to the Tax Department**"  [Emph. Added.] see New York State Department of Taxation and Finance, Tax Bulletin ST-913 (TB-ST-913),

http://www.tax.ny.gov/pubs_and_bulls/tg_bulletins/st/use_tax_for_individuals.htm

exercise of any right or power over tangible personal property incident to the ownership of that property, except that it does not include the sale of the property in the regular course of business. (§ 6009.) "Use" includes the making of a gift of property to others, and, if that is the use which a purchaser of property intends at the time of the purchase, then sales tax applies to the purchase, just as the tax applies to a sale for any other intended use.   (Cal.Code Regs.,  tit. 18, § 1670.)

It is inherently unfair to charge the Cash Sub Class with the "Use Tax" or any other taxes that will be enjoyed solely by the Product sub class. Additionally, as the "Use Tax" rate is the same as the sales tax rate, the use of MSRP also prejudices the Cash Sub Class as they will have to pay higher taxes than if the retail value was set at a lower rate offered by retailers such as Wal-Mart or Costco.  See Table 1 herein.

## F. UNFAIRNESS TO CHARGE THE CASH SUB CLASS  THE RECYCLING FEE ON CANS OF PRODUCT ENJOYED SOLELY BY MEMBERS OF THE PRODUCT SUB CLASS

Red Bull is essentially carbonated suger water contained in an 8.5 oz.- 20 oz. aluminum package and as such is subject to a recycling fee of 5 Cents in the number of states that have such re-cycling programs commonly referred to as "Bottle Bills" including California and New York.[9] The depth of unfairness to the Cash Sub Class goes beyond merely having to pay the recycling costs for the cans that will be consumed by the product sub class but is exacerbated by the fact that the recycling program is implemented differently.  For example, in California, the 5 cent fee is referred to as a California Redemption Value (CRV) and is treated as a "Regulatory fee.

---

[9] Other states include, Connecticut, Guam, Hawaii, Iowa, Maine, Massachusetts, Michigan, Oregano and Vermont. See http://www.bottlebill.org/legislation/usa.htm

Additionally, the CRV is added to the cost of the product for purposes of paying taxes, in this case a "Use Tax" based on an inflated MSRP. [10]  Thus in California and similar states, the Cash Sub Class will have to pay a "Use Tax" on the MSRP per can PLUS the CRV.  Instead of $1.875, they will be charged taxes on $1.925

In New York, the recycling fee is a deposit charged to the "deposit initiator" which would presumably be Defendant as the "bottler" or "distributor" and paid to the state of New York.[11] This deposit must be paid even if the product is given away free of charge. [12]  In New York and the several states that have similar programs, the unfairness to the Cash Sub Class is compounded by the additional insult of having Defendant herein keep 20% of all the deposits from the cans that are not recycled.[13]

---

[10] "In 1986, the Board of Equalization determined the redemption value was not a deposit, but a part of the cost of the product being sold at the retail level. If the product purchased is subject to sales tax, then the redemption value applied to that product is subject to sales tax. If the product purchased is not subject to sales tax, then the redemption value applied to that product is not subject to sales tax.  See http://www.calrecycle.ca.gov/bevcontainer/programinfo/FAQ.htm

[11] A deposit initiator is the first bottler, distributor, dealer or agent to collect the refund value (deposit) on a beverage container sold in New York State.  See http://www.dec.ny.gov/chemical/57687.html

[12] "DEC regulations define the term "sale" as the act of selling or offering to sell, or **distributing for use or consumption**. Therefore, even beverage containers distributed for free must have a deposit initiated and must be properly labeled with the New York deposit." See http://www.dec.ny.gov/chemical/57687.html

[13] "Previously, all unclaimed deposits were kept by the beer and soda distributors who initiated the deposits on beverage containers. The 2009 amendments require that 80% of the unclaimed deposits be remitted to the NYS Department of Taxation and Finance on a quarterly basis."  See http://www.dec.ny.gov/chemical/57687.html

For example, if 100,000 cans are distributed to New York class members, the deposit fee charged by the state to Defendant Red Bull would be $5,000 which Defendant would presumably charge to the Cash Sub Class. Assuming 100% of those cans are NOT recycled, Defendant would be refunded $1,000. As most of the cans will likely be recycled the amount in question would indeed be comparatively little.[14] However, in Iowa, Maine, Oregon and Vermont, the Distributor/Bottler keeps 100% of the deposit on unclaimed/unrecycled containers.[15] Although the refund amount would be comparatively little, in the aggregate they are significant even if not substantial. However, the ignominy visited upon the Cash Sub Class of having Defendant keep even a slight portion of the recycling fee unfairly charged to them simply adds insult to injury.

### G.   THE INHERENT UNFAIRNESS TO THE CASH SUB GROUP ARGUES AGAINST APPROVAL OF THE SETTLEMENT AS THE NAMED PLAINTIFFS DO NOT ADEQUATELY REPRESENT THE INTEREST OF THE ENTIRE CLASS.

The party seeking to certify a class bears the burden of satisfying Rule 23(a)'s four threshold requirements:  (1) numerosity ("the class is so numerous that joinder of all 24 members is impracticable"), (2) commonality ("there are questions of law or fact common to the class"), (3) typicality ("the claims or defenses of the representative parties are typical of the claims or

---

[14] The New York State Returnable Container Act, also known as the "Bottle Bill", has been a tremendous success. Since its passage, the Bottle Bill has achieved significant impacts to create a cleaner and healthier New York. The Bottle Bill has: reduced roadside container litter by 70 percent; recycled 90 billion containers, equal to 6 million tons of materials, at no cost to local governments; http://www.dec.ny.gov/chemical/8500.html

[15] See http://www.bottlebill.org/legislation/usa/allstatetable.htm

defenses of the class"), and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a).

Only the "adequacy of representation" is at issue here. In the instant action, the Plaintiffs are advancing a settlement that unnecessarily forces class members into two sub groups by forcing them to choose amongst either a cash option or a product option. Furthermore, each sub group is limited to a value of $6,500,000 in claims. Whereas the Cash option is capped at $6,500,000 in actual dollars, the Product option is capped at a "retail value" of $6,500,000 benchmarked at a nebulous and undisclosed "MSRP" value presently "estimated" at about $1.875 per can. The settlement further provides that all cost of notice and claims administration and tax and tax expenses are paid from the cash fund BEFORE distribution to the Cash Sub Group. As set forth above, this settlement term unfairly requires the Cash Sub Group to pay administrative expenses and taxes and other charges on a benefit that they cannot use and for the enjoyment by an entirely different sub group. To the extent that these taxes and fees reduce the amount of money available to the Cash Sub group, members thereof are being treated unfairly vis-à-vis the Product Sub group.

An important and illuminating case vis-à-vis the instant settlement is *In re Literary Works in Electronic Databases Copyright Litigation, See* Exhibit 6. In said case, the second circuit reversed the district court's certification of a settlement class on the basis of inadequate representation where there was disparate treatment of one of three settlement sub groups. Despite the settlement being a product of good faith mediation before mediation super star Kenneth Feinberg, Esq., the court stated, "[w]e can discern no reason, and authors and publishers offer none, why this burden should have been placed exclusively on Category C, rather than shared equitably among all three categories of claim. That only one category was targeted for

this penalty without credible justification strongly suggests a lack of adequate representation for those class members who hold only claims in this category." Id at page 26, lines 3-9. The Second Circuit then ordered that the dis-advantaged group be reformed into a distinct sub class with independent counsel.

Similarly, in the instant action there is no explanation, credible or otherwise that would justify charging the cash sub group with the taxes, expenses and fees generated by the product sub group. For example, it is inexplicable why any fees or taxes stemming from the product sub group could not simply be borne by the group through a proportionate reduction of product to reflect the cost and expenses. E.g., if tax and expenses of the product sub group are $100,000 simply reduce the value of this group from a "Gross" amount of $6,500,000 down to "Net" amount of $6,400,000.  Or more granularly, at MSRP of $1.875 per can there are 3,466,666 cans available to the Product Sub Group.  The hypothetical tax and expense of $100,000 is equivalent to 53,333 cans.  Therefore taxes and expenses for the Product Sub Class can be paid by this group by reducing the total 3,466,666 cans available in the amount of 53,333 which represents the taxes and costs associated with this group.  In this scenario, 3,466,666 cans is the "Gross" product settlement and 3,413,333 cans is the "net" product settlement after taxes and expenses are paid.

That plaintiffs herein would advance and defend such unfair term when there are other alternatives is evidence that they are incapable of adequately representing the members of the Cash sub group.  For this reason, short of delaying the settlement by appointing separate counsel for the Cash Sub Class, the settlement should be approved only upon the condition that each sub group pay its own costs, tax and expenses.

## H.  THE ATTORNEYS FEES ARE UNFAIR AND UNREASONABLE BECAUSE THEY ARE EXCESSIVE.

Objectors herein do not dispute Class Counsel's bona fides.  Their caliber and reputation precedes them.  That they can extract in a matter of months a meaningful settlement amount from an extremely wealthy Corporate Defendant represented by a power house law firm in such short order speaks volumes about Class Counsel's abilities.  As such, the instant Objectors do not object to a request of Lodestar Rates billed by partners in the range of $500-$600, and senior or named partners in the range of $600-$750 per hour.

What is objectionable is the total amount of attorney's fees sought as a percentage of recovery or alternatively, the requested lodestar hours plus multiplier that would equate to an amount anywhere near the requested $4,750,000.[16] What is ironic here is that class counsel's requested fees are unreasonable, not because of their lack of ability, but rather their impressive reputation and qualifications.   Class counsel filed the Careathers lawsuit on January 16, 2013 and about two and a half short months later on April 9, 2013, the parties began meaningful discussions on a framework for settlement.

The facts clearly establish that what happened here is what usually happens when highly experienced and skilled professionals are matched against one another. Strategies and scenarios where gamed out and they realized that against an equally skilled opponent, given the risk of litigation, settlement is the preferred outcome as the best scenario going to trial would be a

---

[16] As of the time of this writing, counsel's motion for fees are not available, thus objector herein is forced to surmise if Class counsel seeks a percentage of recovery (which they presumably will) or simply lodestar hours plus a multiplier. Other than a generalized maximum amount of $4,750,000, t is also unknown at this time, how much attorney's fees and costs would specifically be requested.

pyrrhic victory.  It is almost trite to refer to the military strategist Sun Tzu and his treatise on war, but his assessment of military matters are surprisingly harmonious with numerous aspect of litigation and Alternative Dispute Resolution.  It is written, "[i]f you know the enemy and know yourself, you need not fear the result of a hundred battles.  If you know yourself but not the enemy, for every victory gained you will also suffer a defeat."  He also wrote,

"[h]e will win who knows when to fight and when not to fight."  Additionally, Sun Tzu wrote, "[t]herefore the skillful leader subdues the enemy's troops without any fighting; he captures their cities without laying siege to them; he overthrows their kingdom without lengthy operations in the field."[17]  Similarly, counsels herein, understanding the full measure of their opponent decided quickly to settle, even before a response to the complaint was filed, before the ravages of unrelenting discovery was propounded and before the countless volleys of a 100 motions both substantive and sundry were launched.

In analyzing attorney's fees, "[t]he trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation. In contrast, the lodestar creates an unanticipated disincentive to early settlements, tempts lawyers to run up their hours, and compels district courts to engage in a gimlet-eyed review of line-item fee audits." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 121 (internal citations and quotation marks omitted). "[T]he lodestar remains useful as a baseline even if the percentage method is ultimately chosen." *Goldberger v. Integrated Res. Inc.,* 209 F.3d 43,50.

---

[17] Sun Tzu On the Art Of War, Translated by Lionel Giles, M.A., (1910) Section III, Paragraphs 18, 17(1) and 6, respectively.  see http://www.gutenberg.org/files/132/132.txt

Reasonableness is the touchstone for determining attorneys' fees. In Goldberger, the Second Circuit articulated six factors for courts to consider in determining the reasonableness of fee applications: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. 209 F.3d at 50 (internal quotation marks omitted). Most of the Goldberger factors weigh against granting approval of the entirety of Class Counsel's fee application. Objector will only discuss the factors at issue.

### Class Counsel's Time and Labor

The speed at which Class Counsel was able to wrest settlement negotiations from the defendants is evidence that the time and labor expended do not justify $4,750,000 or anywhere near that amount. Furthermore, the sparsely populated court docket is ample proof that the requested fee is excessive. Specifically, the majority of the filings where non substantive in nature, request to extend time to answer, motions for pro hoc vice, a motion to consolidate etc. Assuming *arguendo* that the hourly rate is an extraordinary $1,000 per hour, the requested fee would represent 4,750 hours of work! In a settlement class action such as this where settlement talks began two months after the complaint was filed and a settlement was agreed to 7 months after the complaint was filed and BEFORE the answer was filed, 4,750 hours would be beyond excessive if not ludicrous.

### The Magnitude and Complexities of Litigation

Similar as above, the facts establish that this was never a litigation case. It was simply an invitation to settle where attendance was mandated by a formal complaint. A legal exercise at

best.  The Court Docket tells the whole story.  The Complaint was filed some months later it was settled.  There were no substantive motions in between.  It would also be intellectually dishonest to argue on the one hand that Class counsel is ideally suited to adequately represent the class based on their deep experience and skill in class action matters, and on the other hand claim that the instant litigation was somehow complex, or raised novel legal issues.

### The Risk Of Litigation

The risk of litigation is also an important factor in determining a fee award. Uncertainty that an ultimate recovery will be obtained is highly relevant in determining the reasonableness of an award. *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 470 (2d Cir. 1974), abrogated by *Goldberger,* 209 F.3d 43 (2d Cir. 2000).

Here the risk was minimal.  Class counsel filed the complaint in January 2013, in April 2013 settlement talks began in earnest.  In July 2013 the parties reached a settlement even BEFORE Defendant filed their response to the complaint.  The facts reveal that the risk was never about if there would be a recovery, it was simply what the terms would be.  "As the chance of success on the merits or by settlement increases, the justification for using a risk multiplier decreases." - See *In Re Agent Orange Product Liability Litigation*, 818 F2d 226, 236 (2d Cir. 1987).

### Fee in relation to the settlement

Courts also consider the size of the settlement to ensure that the percentage awarded does not constitute a "windfall." See, e.g., *In re Gilat Satellite Networks, Ltd.,* No. 02 Civ. 1510, 2007 WL 2743675, at *16 n.41 (E.D.N.Y. Sept. 18, 2007).  The requested $4,750,000 in fees and costs represents 36.54% of the $13,000,000 settlement value, which in this circuit is unusually high.

"[A] review of 2008 district court decisions in this Circuit applying the *Goldberger* factors, places attorneys' fees of 28% at the high end of the spectrum. *Farinella v. PayPal,* 611 F.Supp.2d 250 (E.D.N.Y.2009) (Glasser J.)  "See *In re Bayer AG Securities Litigation,* No. 03 Civ. 1546(WHP), 2008 WL 5336691 (S.D.N.Y. Dec. 15, 2008). (fee award of 12% of $18.5 million settlement); *Banyai v. Mazur,* No. 00 Civ. 9806(SHS), 2008 WL 5110912 (S.D.N.Y. Dec. 2, 2008) (fee award of 20% of $6.1 million settlement); *Park v. The Thomson Corp.,* No. 05 Civ. 2931(WHP), 2008 WL 4684232 (S.D.N.Y. Oct. 22, 2008) (fee award of 15.6% of $13 million settlement); *Warren v. Xerox Corp.,* No. 01 Civ. 2909(JG), 2008 WL 4371367 (E.D.N.Y. Sept. 19, 2008) (fee award of approximately 25% of $12 million settlement); *In re Telik, Inc. Sec. Litig.,* 576 F.Supp.2d 570 (S.D.N.Y.2008) (fee award of 25% of $5 million settlement); *Ayers v. SGS Control Services, Inc.,* No. 06 Civ. 7111(RMB), 03 Civ. 9078(RMB), 2008 WL 4185813 (S.D.N.Y. Sept. 9, 2008)(fee award of 19% of $7.25 million settlement); *Top Tankers,* 2008 WL 2944620 (fee award of 10% in $1.2 million settlement); *In re Merrill Lynch Tyco Research Sec. Litig.,* 249 F.R.D. 124 (S.D.N.Y.2008) (fee award of 22.5% of $4.9 273*273 million settlement); *In re Renaissancere Holdings Ltd. Sec. Litig.,* No. 05 Civ. 6764(WHP), 2008 WL 236684 (S.D.N.Y. Jan. 18, 2008) (fee award of approximately 10% of $13.5 million settlement fund); *In re Ramp Corp. Sec. Litig.,* No. 05 Civ. 6521(DLC), 2008 WL 58938 (S.D.N.Y. Jan. 3, 2008) (fee award of approximately 15% of $2.075 million settlement)." Id at 272-273.

In this district the mean average is 22% and in the second circuit it is 23%.[18]

---

[18]  See Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008 Theodore Eisenberg and Geoffrey P. Miller, Table 3 and Table 4, pages 11, 12, respectively.  Attached hereto as Exhibit 7

This action was as a practical matter settled at its inception.   Thus even an award in the mean

average of 22% is an inappropriate "windfall" for Class counsel.   In a class action such as this,

where there was only 56 docket entries (as of the time of this writing) with no substantive or

contested motions, a percentage of recovery in the high teens would work to over compensate

class counsel.   Objector believes that a fair and adequate compensation to class counsel in light

of the speed to settlement is with lodestar hours not exceeding 2000 hours using a generous

blended rate of  between $550-$625 per hour to account for the quality and skill of class counsel

and no multiplier due to lack of any risk.  This produces an attorney fee award in the range of

$1,100,000 -$1,250,000.  Though Class counsel will surely object that 2000 hours is insufficient

because there were two law firms involved, it should be noted that the California action was

duplicative.


## I.   THE ATTORNEYS FEES FOR THE CALIFORNIA ACTION ARE EXCESSIVE BECAUSE THEY ARE DUPLICATIVE

The facts are undisputed that the Wolf and Almarez complaint was filed on

February 27, 2013 in California, by the law firm of Kaplan Fox and Kilsheimer LLP( hereinafter

"the Kaplan Firm").  The California action was filed over a month AFTER the Careathers

complaint was filed in New York on January 16, 2013.  The statement of facts in the "Stipulation

for Settlement" states in no uncertain terms, that the California action was based "on

substantially the same alleged misconduct at issue in the New York Action." See Stipulation for

Settlement, paragraph E, page 3.  Additionally, the parties conceded that, "[t]he California

plaintiffs make **similar allegations** of deceptive conduct arising out of **the same alleged**

**marketing representations** by Red Bull. **Like Careathers, the California plaintiffs seek to**

33

**represent a nationwide class** of Red Bull consumers and demand monetary and injunctive relief, and **assert claims** for unjust enrichment and violations of California consumer protection statutes (**just as Plaintiff Careathers does**). [Emph. Added.]  See Plaintiffs' memorandum of Law in Support of the Joint Motion for Preliminary Approval of Class Action Settlement, p. 5.

Based on the admitted similarity, the California action could be described as a "copycat" litigation.  At best it was a duplicative action that could have been stayed or dismissed under the "First to File" rule.  The rule has two facets: (1) it provides a legal presumption that the first-filed action is the correct forum for the controversy, and (2) it empowers the court to dismiss, stay or transfer a second similar action based on the pendency of the first-filed action.  See *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 625 (9th Cir. 1991), see also *McCain v. Rahal Letterman Racing, LLC,* No. 07-cv-5729 (JSR), 2007 WL 2435170, at *2 (S.D.N.Y. Aug. 27, 2007).

The Law Firm of Morelli Alters Ratner, P.C (hereinafter, "the Morelli" firm) representing Plaintiff Careathers are undoubtedly stating that they are skilled attorneys capable of representing the nation wide class and consequently undercutting any arguments why the second in time California action was necessary.  Thus any claims for hours devoted to research, prosecute or defend the instant class action submitted by the law firm of Kaplan Fox and Kilsheimer LLP should be rejected.  That being said the instant Objector recognizes that there may have been a benefit to the class to have such highly skilled attorneys, although duplicative/redundant in nature, to participate in the negotiation process.  It may have been an express strategy to keep the Kaplan firm involved.  With the attorneys at Skadden, Arps et. al playing defense, this may have been a wise decision.  As the facts reveal that the "California

34

plaintiffs actively participated in the mediation and settlement negotiations,"[19] Objectors herein would not begrudge the Kaplan Firm for "reasonable" attorney's fees and costs directly incurred to attend mediation. Thus Objectors believe that it would be fair to budget at most $200,000 plus their actual cost to attend mediation.

## J.    ANY REDUCTIONS IN ATTORNEYS FEES SHOULD REVERT TO THE COMMON FUND FOR THE BENEFIT OF THE CLASS

The terms of the Settlement specifies that attorney's fees in an amount not exceeding $4,750,000 will be paid directly from the Defendants. Objectors herein do not argue that this arrangement is improper, but Objectors do argue that to allow any attorney's fees not awarded to revert back to Defendant is unfair to the class. This unfairness is clearly evident in the way class counsel asks this court to use attorney's fees in the "Total Settlement Value" as a benefit to the class for purposes of their fee motion premised on a percentage of recovery. Yet, hypocritically they ask the court to suspend reason and disbelief by stating that it is not part of a "common fund", the consequences of which are that any un-awarded attorney's fees revert back to the Defendant rather than to the class. In *Johnston v. Comerica Mortg. Corp.*, 83 F. 3d 241 (8th Circuit 1996), which supports the use of attorney's fees as a benefit to the class, the court ruled "[a]lthough under the terms of each settlement agreement, attorney fees technically derive from the defendant rather than out of the class' recovery, in essence **the entire settlement amount comes from the same source**. The award to the class **and** the agreement on attorney fees **represent a package deal**. Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery." Id at 246. Although this case is from the 8th

---

[19] See Plaintiffs' memorandum of Law in Support of the Joint Motion for Preliminary Approval of Class Action Settlement, p. 6.

Circuit, it was cited with approval in *Parker v. Time Warner Entertainment Co., LP*, 631 F. Supp. 2d 242, 269 (E.D.N.Y 2009).

Thus what is good for the goose should be good for the gander. If attorney's fees are a benefit to the class for purposes of "percentage of recovery" analysis, then any un-awarded fees should revert to the class as it was *ab initio* an "aspect of the class' recovery" pursuant to *Johnston*. It is further unfair to the class to have un-awarded attorney's fees revert to Defendants for several reasons. First, the settlement amount and the attorney's fees amount have already been budgeted by Defendants to buy peace nationwide, thusly they will not fight for the return of un-awarded attorneys fees. Therefore, it would be not just be unfair but unsavory to have Class counsel actually defend a benefit for Defendant (that Defendant will not be asking for) at the expense of increasing the benefit to the class.

### K. THE VALUE OF THE INJUNCTIVE RELIEF AS SET FORTH IN THE SETTLEMENT IS ILLUSORY.

For purposes of increasing attorney's fees as a percentage of recovery, the settlement is drafted such that a value of $18,500,000 was placed on the injunctive relief that was incorporated into the settlement. This number should be rejected as illusory as Defendants changed their marketing practices NOT as a result of the settlement but rather voluntarily as a response to the allegations set forth by the complaint. This is evident in the Stipulation for Settlement which reads "…[w]hile Red Bull believes that its Marketing and labeling directed at United States consumers have always been entirely truthful and accurate, and that **its recent voluntary update** in any event satisfies statutory safe harbors for consumer protection statutes…" [Emph. Added.] See Stipulation for Settlement p. 21, Paragraph B(3). This fact is also confirmed in Class Counsel's letter to the Court Dated Oct. 4, 2013 which reads in pertinent parts, "…**in the wake**

36

**of the filing** of Mr. Careather's complaint, **RBNA made substantial changes to the sales and marketing messages** and information available on its U.S. consumer web sites, which addressed many of the allegations in Mr. Careather's complaint." [Emph. Added] See Letter to the Court, October 4, 2013, Docket Entry 20.

## L.    THIS COURT SHOULD USE A STRIKE PRICE OF $1.00 INSTEAD OF M.S.R.P. TO DETERMINE THE AMOUNT OF PRODUCT AVAILABLE TO THE PRODUCT SUB CLASS.

To overcome the inherent unfairness to the product sub-class of using M.S.R.P. as mention herein, the court should rely on a "strike price" of $1.00 instead.  The benefits of using $1.00 is that it is also more accurate, predictable and understandable, compared to M.S.R.P. To be clear, each can only costs Defendant about $0.61 or less (assuming marketing costs are excluded).  Thus it is unfair to allow Defendant to buy nation-wide peace at a discounted cost to them by providing a product to the class at a price (M.S.R.P.) that is actually higher than the actual retail price widely available across the U.S.  See Table 1 above.  As seen herein, that also includes getting it free of charge directly from Defendant Red Bull's website.  A real benefit to the product sub class would be to receive something that it could not get but for the settlement e.g. more than 1 four-pack of Red Bull.  Additionally, there is no certainty of what M.S.R.P. is presently or even on the day of the hearing on final approval.  This creates unnecessary risk that the Settlement is not ready for final approval.  In the alternative, this Court should use the lowest available "Retail Price" of $1.23 as seen in Table 1 herein.

## M.    INCENTIVE AWARDS TO PLAINTIFFS

Incentive awards of $5,000 in general are not excessive per say and in many instances may be reasonable.  However, for the reasons argued in the objections for attorneys' fees herein,

the incentive awards in the instant case is excessive. Specifically, this class action was largely settled a few months after it started before the onset of lengthy discovery or deposition etc. However, as the named party in the lead case, Objectors would not object to $2,500 as a reasonable award to Plaintiff Careathers. As for Plaintiffs Almarez and Wolf, they were plaintiffs in a copycat case and was thus largely redundant. However, as their attorneys brought significant "reputational" benefits as set forth herein, Objectors would not object to $1,000 each.

## IV    CONCLUSION

Based on the preceding, Objector's pray that this Honorable Court will grant final approval of the settlement class on the following conditions:

a.  Cost and Expenses related to Notice and Claims Administration to be borne equally between the Cash Sub Group and the Product Sub Group;

b.  Cost and Expenses specific to a Sub Group Shall be borne by that sub group;

c.  Specifically, Costs of issuing settlement checks to the Cash Sub Group belongs to that sub group. Use Taxes and other charges unique to the Product Sub Group shall belong to the product sub-group with Defendant Red Bull allowed to reduce the product amount available to this sub group pro-rata to account for said taxes and charges;

d.  Defendant Red Bull will pay the cost of the $0.05 regulatory fee/recycling deposit imposed by any and all jurisdictions related to the distribution of its inventory to the Product sub group;

e.  Product allocation to the Product Sub Group shall be based on a fair value of $1.00 per 8.5 oz can, resulting in a gross product amount to the Product sub group of 6,500,000 8.5 oz cans.  Defendant may vary the size of the cans or the amount per package, but any variations in size shall be based on 11.764 cents per ounce of product;

f.  Attorneys fees to the Morrelli Firm shall not exceed $1,250,000 with all actual reasonable costs granted;

g.  Attorneys fees to the Kaplan Firm shall not exceed $200,000 with actual cost to attend mediation granted;

h.  Incentive awards to Plaintiff Careathers granted in the amount of $2,500 and Plaintiffs Almarez and Wolf not to exceed $1,000 each;

i.  All attorneys fees and costs as well as Incentive awards not granted shall revert to the class. The reversionary amount to the class shall be distributed half to the Cash Sub Group and the other half to the Product sub group to pay for its taxes and expenses or alternatively to be applied to acquire additional product at the price set forth herein

Dated: 3/29/15

Respectfully Submitted

Law Office of Quyen C. Hoang
17011 Beach Blvd, Suite 900
Huntington Beach, CA 92647
Attorney for Objectors Patrick Cruz
and Ruben Quinones