USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: April 21, 2015

December 01, 2014

Via Priority Mail

Clerk of Court

The United States District Court

For The Southern District of New York

500 Pearl Street

New York, New York 10007-1312


Christopher Andrews, Pro se,


Case No.1:13-cv-00369-KPF

Case No.1:13-cv-08000? KPF

**"Notice of Intention to Appear"** and

**OBJECTION TO PROPOSED RED**

**BULL CLASS ACTION**

**SETTLEMENT** against approval based on

issues with settlement amount, notice

program, class counsel's fees, incentive

awards, release, unknown class damages,

plan of allocation and cy pres plan.

Date of Fairness Hearing: May 01, 2015

Time: 10:00 am EST

Courtroom of Judge Katherine Polk Failla

United States District Court

Southern District of New York

Benjamin Careathers, individually, and on behalf          Case 1:13-cv-00369-KPF


Of all others similarly situated,
                                        Plaintiff,

            Vs.

Red Bull North America, Inc., a California

Corporation,
                                        Defendant,

_____

David Wolf and Miguel Almaraz individually,   Case 1: 13-cv-080008-KPF

 and on behalf of all others similarly situated,
                                        Plaintiffs,

Red Bull GMBH, foreign company; Red Bull

North America, Inc, a California corporation;


And Red Bull Distribution Company, Inc., a

Delaware corporation,
                                        Defendants,

**Tables of Authorities:**

*Bluetooth,* 654 F.3d at 947……………………………………………………….45

Stanton, 327 F.3ʳᵈ at 964……………………………………………………….45

See Staton v. Boeing Co., 327 F.3d 938, 975 (9th Cir. 2003)………………….46

*Weseley v  Spear, Leeds & Kellogg,* 711 F. Supp. 713, 720 (E.D.N.Y. 1989);…46

see also Women's Comm. for Equal Employment Opportunity v. Nat'l Broad. Co.,

76 F.R.D. 173, 180 (S.D.N.Y. 1977)………………………………………….46

*Cook v. Niedert,* 42 F.3d 1004, 1016 (7th Cir. 1998)………………………….48

*See, e.g., Radcliffe v. Experian Info.,* 715 F.3d 1157, 1164–65 (9th Cir. 2013)…46

*Vranken v.Atlantic Richfield Co.,* 901 F.Supp. 294, 299 (N.D. Cal. 1995)………48

Global Materials v. Superior Court, 113 Cal. App. 4th 836, 851 (2003) ………..48

; see also Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir.

1978),………………………………………………………………………….48

citing Nat'l Assoc. of Reg'l Med. Programs, Inc. v. Mathews, 551F.2d 340 (D.C.

Cir. 1976); Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3:23

(4th ed. 2002)………………………………………………………………….48

*See, e.g., Radcliffe v. Experian Info.,* 715 F.3d 1157, 1164–65 (9th Cir. 2013)…49

*Porter v. Nationscredit Consumer Disc. Co.*, 2004 U.S. Dist. LEXIS 12641, at *6–8 (E.D. Pa. July 8, 2004)………..………………………………………………49

*In re Sheffield*, 280 B.R. 719, 722 (Bankr. S.D. Ala. 2001)……..……………...50

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. Cal. 2009)……...50

In Mercury Interactive Corp., 618 F. 3rd 988, 994-95 (9th Cir. 2010) (quoting In re Washington Pub. Power Supply Systems Lit. 19 F. 3d 1291, 1302 (9th Cir1994.50

In re Relafen Antitrust Litigation, 360 F. Supp.2d 166, 192-94 (D.Mass. 2005), citing inter alia Amchem Prods., Inc v Windsor, 521 U.S. 591, 617, 623 (1997) (Rule 239e). …………………………………………………………………50

Reynolds v. Beneficial Nat't Bank, 288 F. 3d 277, 279-80 (7th Cir. 2002)……51

In re General Motors Corp, Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55F. 3d 768, 785 (3d Cir. 1995) (quoting Grunin v International House of Pancakes, 513 f. 2d 114, 123 (8th Cir.1975))…………………………………………………51

True v American Honda co. 749 F. Supp. 2nd 1052, 1080 (C.D.Cal. 2010) ( citing 4 Newberg on Class actions $ 11:42 (4th ed 2009)). Accord American Law Institute, Principles of the Law of Aggregate Litig. $3.05 © (2010) (Ali Principles")……51

Hanlon v. Chrysler Corp., 150F. 3d 1011, 1021 (9th Cir. 1998); In Bluetooth Handset Prods. Liability Litig., 654 F. 3d 935, 947 (9th Cir. 2011)……………52

Grovev Principal Mut. Life Ins. Co., 200 F.R.D. 434, 447 (S.D. Iowa 2001) citing In re Gen Motors Pick-Up Litig., 55 F. 3d at 789.)………………………………53

See In re Gen. Motors PickUp Litig,. 55 F. 3d at 813.................................53

In (*Radcliffe v. Experian Information Solutions Inc.* (--- F.3d ----, C.A.9 (Cal.),

May 2, 2013)...................................................................54

*Vassalle v. Midland Funding LLC*, 708 F.3d 747 (6th Cir. 2013)...................55

*In re Dry Max Pampers Litigation*, No. 11-4156, 2013 WL 3957060 (6th Cir. Aug.

2, 2013).  In re Pet Food Prods. , 6?? F.3d 333, 355 (3d Cir. 2010).................55

In re GM , 55 F.3d at 808.............................                       ........55

Vassalle v. Midland Funding LLC , 708 F.3d 747, 755 (6th Cir. 2013)............55

*In re Dry Max Pampers Litigation*, No. 11-4156, 2013 WL 3957060 (6th Cir. Aug.

2, 2013)...................................................................55

*In re Gen. Motors*, 55 F.3d at 800 (citations omitted)...............................56

*In re Gen. Motors*, 55 F.3d at 795 (citing *Eisen v. Carlisle & Jacquelin*, 391 F.2d

555, 562 (2d Cir. 1968))...................................          ...........56

*Wetzel*, 508 F.2d at 247.......................................................56

*Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997)...............................56

*McCrary v. Elations Co.* 2014 U.S. Dist. LEXIS 8443, at *36 (C.D. Cal. Jan. 13,

2014)...........................................................................56

*London v. Wal-Mart Stores*, 340 F.3d 1246, 1255 (11th Cir. 2003); *see also*

*Sippper v. Capital One Bank*, 2002 U.S. Dist. LEXIS 3881, at *7–8 (C.D. Cal. Feb.

28, 2002.......................................................................57

*See In re Gen. Motors*, 55 F.3d at 801-03.................................................57

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 619-20 (1997)..................60

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 203 (D.Me.2003); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315, 70 S.Ct. 652, 94 L. Ed. 865 (1950)..........................60

**Statutes, Rules and Regulations**

28 U.S.C. 1746 ................................................................................8

28 U.S.C. § 1711.............................................................................11

Federal Rules of Procedure 23...........................................................11

Rule 54(d)(2).................................................................................12

Rule 23.......................................................................................18

§ 1542 of the California Civil Code......................................................40

Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1715....................43

Rule 23(h)....................................................................................46

Rules 23(a)(4) and (g)......................................................................46

Fed. R. Civ. P. 23,..........................................................................45

Rule 23(c)................................................................................56

Fed.R.Civ.P. 23(c) (2) (B)................................................................59

Fed.R.Civ.P. 23(e)(1)......................................................................59

*See* Fed. R. Civ. P. 23(a)(4);............................................................58

Fed.R.Civ.P. 23(c) (2) (B)................................................................58

Fed.R.Civ.P. 23(e)(1)......................................................................58

Rule 23(a)(4),...............................................................................59

Rule 23(e)....................................................................................60

Rule 23(a)....................................................................................60

Rule 58 of the Federal Rules of Civil Procedure....................................60

Rule 23(a)....................................................................................63

**Other Miscellaneous Terms**

Bloomberg Business article "Red Bull's Billionaire Maniac" excerpts.........23, 24

Pacer.........................................................................................45

Fed Fund Rate............................................................................... 46

Thedore Eisenberg & Emperical Issues, 57 VAND .L. Rev. 1529, 1532 (2004). .. 53

Due process under the Constitution......................................................64

"Red Bull's Billionaire Maniac"......................................................64

## Table of Contents:

Introduction:.............................................................................8

Statutes, Rules and Regulations ...................................................11

Federal Rules of Federal Procedure 23...........................................11

The "Order Granting Preliminary Approval of Class Action Settlement" Has Issues
And Contain A Nefarious Conflict................................................14

Issues With The Settlement Include But Are Not Limited To.................16

Settlement Amount Appears Too Low ...........................................20

The Settlement Fund has Issues...................................................25

Plan of Allocation Is Flawed.......................................................26

Objection To Attorney Fees.........................................................31

Issues with Stipulation of Settlement............................................33

Cy Pres Program.....................................................................44

Notice to State And Federal Officials Appears Missing......................44

Missing Interest into the Class Settlement Fund……………………………46

A Showing Of Explicit Collusion Is Not Required To Demonstrate Settlement

Unfairness……………………………………………………………...…47.

A Class Should Not Be Certified When the Primary Beneficiaries Are Class Counsel

And Named Plaintiffs…………………………………………………..…48

The Court Has A Fiduciary Duty to The Unrepresented Members Of The

Class……………………………………………………………………52

Public Policy Reasons Mean That the Court Should Not Infer Settlement Approval

from a Low Number of Objectors…………………………………………54

Adequacy of Representation…………………………………………....…58

Suggested Attorney Fee…………………………………………………..…61

Deny Motion to Certify……………………………………………..….…61

CONCLUSION………………………………………………..…..…63

Bloomberg article "Red Bull's Billionaire Maniac"……………..…………65

## INTRODUCTION:

Objector does not like sending copies of the objection to two and three addresses for each of the several law firms involved when one address for each office would be sufficient. Since the objection will be sent to them via ECF after the Court receives it

this is a waste of trees, time and money. So, counsels are not going to like the role reversal this objector is about to put them into.

Objector Christopher Andrews affirms, under penalty of perjury in accordance with 28 U.S.C. § 1746, that:

(i) Objector made at least one retail purchase of Red Bull products in the United States between January 1, 2002 and October 3, 2014;

(ii) Objector is not a Red Bull employee, officer, director, agent, or representative;

so objector is a qualified member of the class.

(iii) Objector did not make such purchase for resale.

Objector has sent in a claim form which was received by the administrator on November 24, 2014. The objector was forced to select a particular settlement benefit because choosing the other option rips the class off and intentionally and artificially reduces the number of claimants that could receive that full benefit. More about that later. Objector's mailing address is PO Box 530394 Livonia, MI 48153. The telephone number is 1-248-635-3810. E-mail is caalcu@gmail.com

Objector is not an attorney and intends to appear at the fairness hearing on May 01, 2015 and request's the following:

- An opportunity to speak to the Court.

- The option to cross-examine any witnesses who may testify at the hearing in support of settlement approval.

- A list of any witness or named plaintiffs to be called with their cv (resume) and the specific scope of their testimony and copies of any evidence they may or will introduce at the hearing.

- The option to perform discovery on certain issues that are described below per Rule 23 if necessary.

- Objector reserves the right to file a sur-reply if necessary.

- Objector reserves the right to supplement this objection at any time if the parties introduce new facts, evidence, arguments or valuations after July 31, 2014, the date of the stipulated settlement.

- Objector does not intend to call any witnesses at the fairness hearing at this time but reserves the right to and make use of any and all documents entered on to the docket by any settling party/objector/witness or any visual items used at the fairness hearing.

- Objector incorporates any other objections received in this matter into this objection that are not inconsistent with his own and reserves the right to amend and expand on those objections at any time.

- Objector adopts all definitions used in the complaints, amended complaints, preliminary approval papers, Stipulation of Settlement and future final approval papers.

- Objector request a copy of reports and/or summaries showing the credible, legal, economic methodology and analysis performed that proves the total calculation of class damages, class damages settled for and how the alleged $18.5 million value for the label and marketing changes was arrived at. Objector agrees to sign a confidentiality agreement to view the requested information and a response if any can be filed under seal if required.

- Objector requests copies of the correspondence that the plaintiffs and defendants exchanged regarding the sufficiency of the allegations of the Complaints.

## The Beginning

Objector states that this settlement, as is, does not fit the requirements under Rule 23, a slam dunk for rejection.

## Statutes and Rules

28 U.S.C. § 1711 note. (Applicable parts only)

§ 2(a) Findings. Congress finds the following: ...

(3) Class members often receive little or no benefit from class actions, and are sometimes harmed, such as where—

(A) counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value;

(B) unjustified awards are made to certain plaintiffs at the expense of other class members; and

(C) confusing notices are published that prevent class members from being able to fully understand and effectively exercise their rights.

## Federal Rule of Civil Procedure 23. Class Actions.

(a) Prerequisites. (Applicable parts only)

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(4) the representative parties will fairly and adequately protect the interests of the class.

## (e)   Settlement, Voluntary Dismissal, or Compromise.

The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

(3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

**(g) Class Counsel.**

(4) *Duty of Class Counsel.* Class counsel must fairly and adequately represent the interests of the class.

**(h) Attorney's Fees and Nontaxable Costs.**

In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

(1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

(2) A class member, or a party from whom payment is sought, may object to the motion.

**Preliminary points of concern which give the objector and should give the Court cause to pause.**

Here are some concerns for class counsel to address, repair and modify before the Court can rule for possible approval of the proposed settlement. The Court is a fiduciary of the class and subject to the high duty of care that the law requires of fiduciaries.

**The "Order Granting Preliminary Approval of Class Action Settlement" Has Issues and Also Contain A Nefarious Conflict**

Paragraphs 22 states:

"All papers in support of final approval of the Stipulation and in support of Plaintiffs' applications for attorneys fees and expenses and class representatives incentive awards shall be filed no later than thirty (30) days prior to the Final Approval Hearing."

Paragraph 24 states:

"Any objections to the stipulation must be filed with the Court and served on the Parties' Counsel not less than thirty days prior to the Final Approval Hearing."

See the problem? Class Counsel may file their papers on the last day and that leaves not even one day for class members to receive, review, compose, mail and

have the objections arrive at the Court the same very day. That was by design to scare off any potential objections along with mailing out eight copies of the objection, halt the thorough evaluation of the papers by the class members and prevent any objections from being timely filed. Class members considering objecting are also forced to mail seven copies of the objection to class counsel, all of whom have two or three different office addresses for each firm. This indicates bad faith by both parties in this settlement.

To prevent the double drop dead date scenario above from occurring, this objection is being filed today; way ahead of time and a supplement will also be filed once class counsel files their final approval papers. If class counsel files their final papers without adequate time for the objector to respond, objector requests that the supplement still be admitted to the docket and granted due consideration. The objector will continue to dig for more information in the mean time.

To fix this double drop dead date for the rest of the class, both counsels should file their final papers at least thirty days before the deadline to allow adequate review and for any objections to be filed. The papers should be filed on the website immediately once filed with the Court. Any late objections should be allowed to be entered on the docket and considered. Objector requests that all papers filed by either counsel be sent to him via email and snail mail per the rules. Objector would

like copies of any filed documents in the future to be sent from each address the objector sent the objections to and will be forced to send his responses/correspondence to in the future to, excluding the court. Fair is fair.

**Issues With The Settlement Include But Are Not Limited To:**

- Recovery of more than the $13 million value settlement fund today is assured based on the evidence below that requires changes be made before approval can occur.

- Not fair, reasonable and adequate in all respects.

- Not in the best interests of the class members.

- Not in the public interest.

- Runs contrary to public policy.

- Violates due process clause.

- Continued litigation does not pose substantial risks of reducing defendants' ability to fund a settlement or judgment, rather it is more likely the settlement will rise by many multiples.

- The Settlement does not appropriately balance the risks of litigation and the benefit to the settlement class victims of a far superior recovery.

- Continued litigation does not pose substantial risks in establishing liability.

- Continued litigation does not pose substantial risks in establishing damages.

- Balancing the certainty of a curb high immediate recovery of $13 million (half cash and half product) vs. a better negotiated settlement, summary judgment filing or trial, logically an increased offer the closer to trial dictates and favors the continuation of the suit.

- Based on the fees Class Counsel wants to charge to the class, the settlement is unapprovable compared to the total class damages and the amount that each class member will receive.

- The incentive awards may be fatal to the adequacy of class representatives and counsels.

- The notice and administration fees are part of the settlement fund which unfairly reduces the amount left over to pay claims by damaged class members. The defendant or class counsel should in good faith pay any fees related to notice and administration. This needs to be corrected.

- Defendant, with class counsel's blessing, is gouging the class on the $15.00 retail value of the four pack product option being offered to the class and is overcharging and therefore shortchanging the class by $3.9 million to the benefit of the defendant and to the detriment to the class members. This really needs to be fixed or no deal.

○ Class counsel does not cite any evidence or authority of any kind to support their conclusory assertion that the label and market changes are worth $18.5 million. They are worth zero ($0) in this action as far as using it as a settlement benefit to the class, establishing damages, attorney fees and incentive awards per various district and circuit court ruling all over the country and should not be used when considering the attorney fee request.

Not on the website's first page and should be:

"This website is authorized by the Court, supervised by counsel and controlled by the Claims Administrator approved by the Court. This is the only authorized website for this case."


Does class counsel have evidence proving the claims they made?

Does the defendant have evidence proving their product meets the claims they made?

It's hard to know without any or very little low level discovery in this case.

The questions below will help determine if the settlement is fair reasonable and adequate when comparing the class damages to the settlement amount.

**What are the total possible class damages during the class period?**

What percent of total class damages does the $13 million represent?

**What is the damage premium amount or percentage amount that class members overpaid for each can, on average, that Red Bull sold in the United States during the class period compared to their competitor's product that counsels claim are the damages in their complaints?**

If we don't know the answers to the questions above, how can a settlement amount be determined and a fair, adequate and reasonable settlement be proposed to begin with?

Objector requests a copy of reports, summaries, and tables, est. that shows the credible legal and economic methodology and analysis that was performed that proves the total numbers above. Yes objector agrees to a confidentiality agreement. Since there is no protective order issued in this case, the review of any information received from the defendant, if any, was low level at best. In fact the information the objector discovered including the article at the end of the objection contains more information regarding the potential damages to the class than anything on the docket and that has been disclosed to the class and possibly the Court.

## Settlement Amount Appears Too Low

The settlement amount is too low based on just the 2012 sales year alone by the
defendant which does not count any of the other eleven years of sales in the class
period.

In 2013 defendant had approximately $5 billion Euros ($6,250,000,000 American)
in revenue by selling 5.4 billion cans worldwide. Approximately 1.65 billion cans
were sold to the class during 2011 in the U.S. alone, with $387 million spent on
advertising (worldwide) during that time period.

After subtracting out the $387 million from the $6.2 billion in revenues we are left
with about $5.8 billion gross divided by 5.3 billion cans is approximately $1.09 per
can in revenue for 2012.

Since the defendant sold 1.65 billion cans in the US in the year 2011 at $1.09 each
that would put revenue at $1.8 billion for 2011, which would be the maximum
class damages per can sold for that year only, assuming a total refund is in order.

If the damages to the class are measured by a refund of the purchase price for
twelve years than we are talking $10.0 billion plus dollars so $13 million is too
low.

If we are talking damages as a premium overcharge of the purchase price paid by class members that class counsel claims as damages to the class in their complaints, we are talking less damages. That amount is still a light year away from the settlement amount of $13 million as described below.

The total class damages calculated can be by error or design make the defendant's offer look better, much better than it really should be for settlement purposes. Objector has firsthand knowledge of class damages being intentionally undercounted for settlement purposes by an "expert" in one case and this could be another based on the number class counsel and defendant eventually come up with for total class damages in the future so it must be looked at carefully.

Below are a few excerpts of the rarest of rare interview with of one of the original founder's and owner of the company known as Red Bull. The full article is at the end of the objection pages sixty four to eighty (64-80) and is a great read.

Page 69 of the objection is where the excerpt comes from:

"and launches into a spiel he's been delivering for the past 15 years. **In near-perfect English, he explains that Red Bull is not just a drink. Instead, it is a "philosophy"—one seemingly derived from his own outlook on life—and a "functional product," used to improve strength and performance and to revitalize the body and mind.**

Page 72 of the objection is where the excerpt comes from:

**At about $2 a can, it was far-and-away the most expensive carbonated drink on the shelves. "If we'd only had a 15 percent price premium, we'd merely be a premium brand among soft drinks, and not a different category altogether," says Mateschitz.** In 1987 he introduced the drink in Austria. Next came Hungary, the U.K., and Germany, and before long sales were spiking all over Europe.

Page 74 of the objection is where the excerpt comes from:

**Mateschitz says he didn't care about the taste issue then, and he doesn't care about it now. "It's not just another flavored sugar water differentiated by color or taste or flavor," he says. "It's an efficiency product. I'm talking about improving endurance, concentration, reaction time, speed, vigilance, and emotional status. Taste is of no importance whatsoever."**

(The article continues on the same page) Enter the "crucial" ingredient: taurine, an amino acid found in meat, eggs, and human breast milk. While some studies have shown small doses of taurine to be beneficial against problems ranging from epilepsy to cardiac arrhythmias, there's scant evidence of its impact on the body, positive or negative. A "nonessential" amino acid, it's manufactured from other amino acids in the liver, and scientists say it's therefore unnecessary to a healthy

diet. **But Mateschitz scoffs at this. "We have meters and meters of scientific**

**evidence and support" showing its benefits, he says.**

Was the owner that was quoted above deposed, regarding the statements he made

in the full article located at the end of the objection and also have the "meters and

meters" of evidence in his possession been reviewed by class counsel?   If not, why

not? Wouldn't it be a good idea to do that before settling the case?

Based on the lack of evidence in the settlement papers, docket and this objection,

with very little if any discovery being performed, an informed evaluation by the

Court without the answers to the questions above can't be made under Rule 23

because there can be no understanding of the strength of the merits of the case, the

available defenses, the amount in controversy, and the realistic range of outcome

of the litigation. This proposed settlement has issues.

The owner in the article implies the premium over other drinks in its category is a

lot more than 15% of the $2.00 per can purchase price. $2.00 a can multiplied by a

minimum of 15% premium is .30 a can.

$.30 a can multiplied by 1.6 billion cans sold in one year during the class period is

$480 million in class damages. Counsel settled for just $13 million or less than 3

cents on the dollar. Clearly the class damages are in the billions for the entire class period. Not acceptable.

If the premium overcharge is say just $.05 a can multiplied by 1.65 billion cans sold in the U.S. is equal to $82.5 million in damage overcharges just in 2011 alone. If you take that as an average for 2012, 2013 and half of 2014, it is three and a half times the $82.5 million or $288 million, about 4.6% of the premium overcharge damages recovered for the class in just a three and a half year period not the twelve year plus class period. The $288 million number above can be doubled for every .05 increase in premium overcharge price. There is still eight and one half years of damages remaining to be calculated with sales rising every year for the product! The damage amount recoverable by the class using the premium overcharge as damages appears too low compared to over a billion dollars in class damages.

## The Settlement Value Fund Calculation Has Issues

The $13 million settlement fund is for administration, notice, products and cash. Excluding the unknown costs that are being taken out of the settlement fund prior to the class receiving it's portion for the moment, if we take the $13 million gross divided by $10 each (assuming all claimants took the cash option and not the product option) is 1,3 million people can claim the full $10.00 amount prior to the amount being reduced pro-rata. For every 1.2 million claims the amount is reduced

10% per claimant and that is before costs are subtracted out! Once the number of claims are submitted compared to the total number of potential class members eligible to file a claim and since the defendant is only contributing $6.5 million in cash with the balance in artificially inflated retail product option, the likelihood of anyone receiving a $10.00 check is questionable at best. Let's do a breakdown.

$6.5 million in cash that defendant is to provide divided by $10.00 cash benefit is a maximum of 650,000 class members in theory could receive the $10.00 advertised amount and costs are being taken out of the cash fund first before the pro-rata clause kicks in! Is each class members going to receive a check for a few dollars if millions file a claim when there are literally tens of millions of class members

Administration and notice costs should be paid by defendant and/or class counsel and they should not come out of the settlement fund. What does it cost to process and cut a check for say $5.00 to each class member who files a claim and why can't Red Bull do it themselves to save the class money. All they have to do is obtain a flash drive with all the claims data on it from the administrator and send out checks from the CEO's USA office in California. This option should be investigated. By the way what is the notice program and please describe it in detail, it seems there is none right now except for a news release.

Plan of Allocation Is Flawed

## PRODUCT OPTION's RETAIL VALUE IS ARTIFICALLY INFLATED

Counsel states out of the Stipulation of Settlement agreement:

22. ""Product Option" means the option selected by valid Claimants on the Claim Form to obtain certain free Red Bull Products either Red Bull ® Energy Drink or Red Bull © Sugarfree) valued at the Retail Value of $15 or as close to that value as commercially reasonable(potentially subject to an increase or decrease in that value pursuant to §§IV.A.6 or IV.A.9 below) Product packaging (e.g. four -pack) and sizing (e.g.8.4 ounce cans) shall be determined by Red Bull at its discretion after the final value of the Product Option has been determined in accordance with § IV.A below ."

Number 23. Stipulation of Settlement states in part.

"Product packaging (e.g. a four -pack) and sizing(e.g.8.4 ounce cans) shall be determined by Red Bull at its discretion after the final value of the Product Option has been determined in accordance with §IV.A. below"

25. ""Retail Value" means the Manufacturer's Suggested Retail Price as of the date of delivery of the Red Bull ® Energy Drink or Red Bull ® Sugarfree products distributed in fulfillment of the Product Option to valid Claimants."

Response: Class counsel and defendant are cheating the class. They are valuing the product option four pack at a retail price of $15.00 instead of a maximum of $5.98 or less. At a Wall Mart store in Livonia Michigan a four can, 8.4 ounce pack is $5.98 as of November 24, 2014 at 7:51 am. This is not a sale price but a regular price. The overcharge difference of $9.02 per pack, per claimant, is an overcharge of 151% to the class meaning the class members and the settlement fund is being unfairly and unreasonably short changed each time a product is selected by a class member on the claim form. C'MON MAN! Class Counsel and the defendant need to revalue the four pack at a reduced retail rate of $5.98 maximum for settlement purposes. A single can purchase at the same location, at the same time as described above, is $1.88 each multiplied by four cans is $7.52 and not $15.00. C'MON MAN!

In fact the value should be at the **wholesale** price which would be even less than the $5.98 price because at a retail price the defendant is still making money! This change will put millions more dollars of product into the hands of the class members who would receive a unfairly reduced pro-rata share or possibly nothing at all if there are a substantial number of filed claims if nothing is changed. The true wholesale cost of the four pack needs to be disclosed to the objector and the Court so the class is not taken advantage of and the value reworked to benefit the

class. By using the wholesale cost, the class, as a whole, would receive additional benefit because that lower attributable cost difference increases the settlement fund. Using their false retail amount artificially reduces the benefit to the class substantially, a deal breaker for this case.

If we take the $13 million fund subtract out the $6.5 million in cash we are left with $6.5 million worth of product to distribute to damaged class members. If we take the $6.5 million product option and divide it into the artificially inflated retail price of $15.00 per four pack, a maximum of 433,333 class members can be compensated with the four pack product before the value fund runs out and pro rata kicks in.

If we take that $6.5 million product value and use the Wall Mart true and accurate regular retail price of $5.98 per four pack instead of the $15.00 and divide that into the settlement fund value of $6.5 million, approximately 1,086,956 class members can receive a four pack instead of the 433,333 class members. Taking the 1,086,956 subtracting out the 433,333 means an additional 653,623 class members will receive the full four pack benefit product before the pro-rata clauses kicks in.

That difference of 653,623 product for the four pack is a saving of $9.02 per product (($15.00 (their value) - $5.98 (true value) = $9.02)) which buys one and a half four can packs for each additional product option claimed. The value to the

class of the additional 653,623 product four pack available to the class multiplied by $5.98 each is worth a credit or increase to the value of the class settlement fund of $3,908,665.54. You are welcome class.

The objector wants each claimant to receive a minimum of $10.00 that is **NOT** a pro-rata amount and each class member is also to receive a full four pack of product, not a pro-rata, not just one or two cans in the mailbox.

The total amount of claims filed ( both cash request and product option ) will be known before the Fairness Hearing so counsel should bring those numbers with them and be prepared to defend them, if at all possible. Objector's mailing address is PO Box 530394 Livonia, MI 48153. The telephone number is 1-248-635-3810. E-mail is caaloa@gmail.com.

If the class gets no justice, the lawyers get no peace. (aka piece) (A hybrid lyric borrowed from Mr. L. Shabazz.)

**Objection to Attorney Fees:**

Objector objects to Carethers counsel's $3,500,000.00 fee request for five months of work.

**Objector Objects To The Careathers Fee Request.**

The Careathers complaint was filed on January 27, 2013 and the Memo of Understanding was agreed to on July 12, 2014 for a total of 24 weeks. The attorney fee for the Careathers complaint of $3,500,000.00 broken down into 24 weeks is $145,833.33 per week. Broken down into the five day work week is $29,166.66 per day Monday through Friday. Broken down into an eight hour day is $3,645.75 per hour. Objector thinks not, with hardly any motion, discovery or depositions taken. It's a bit high, how about a light year high without even seeing the lodestar breakdown per lawyer.

Objector states we will see artificially inflated rates and hours claimed by multiple attorneys all in an attempt to justify the unjustifiable windfall fee.

**Objector Objects To the David Wolf and Miguel Almaraz Copycat Lawsuit Attorney Fee Request Of $1.2 million.**

The suit was filed on February 27, 2013 and the deal reached on July 12, 2013, representing nineteen weeks or just four and three quarters months of work. Breaking down that $1,200,000.00 into the nineteen weeks is $63,157.89 per week five days week Monday through Friday. Broken down on a daily basis is $12,631.51 per day and broken down into an eight hour day is equivalent to

$1,573.94 per hour. Objector thinks not, with hardly any motion, discovery or depositions taken. It's a bit high, how about a light year high too for the same reason above.

Objector requests that any fees (if any are eventually awarded) and expenses awarded to class counsel under the maximum of $4,750.000.00 be added to the class fund for distribution to the damaged class members and not revert to the defendant. The parties did not state in their papers where that savings goes to, so it goes back to the class fund. Objector objects to changing this now.

## Issues with Stipulation of Settlement

Some terms and additions that should have been included are not. For example: The claim form states:

"Failure to provide all information requested in the Claim Form will not necessarily result in nonpayment of a Claim. Instead, the Class Action Settlement Administrator will take all adequate and customary steps to determine the Claimant's eligibility for payment based on the information contained in the Claim Form or otherwise submitted, the amount available to pay all valid Claims, and such other reasonably available information from which eligibility for payment can be determined."

Response: Why should claimants be required to provide both phone numbers and/or email addresses? If claimant refuses to provide both or only one and not the other do they forfeit their claim? This is not explained and the claim may be rejected. This should be modified by class counsel, defendant and the Court to allow claims to be processed with or without one or both of the missing items or they may receive nothing which is unfair.

Since it appears the claims process was forgotten about after the attorney fees were agreed to, counsels failed to include the following missing three paragraphs which now needs to be added to the Stipulation of Settlement as an amendment or modification:

**"Notice of Missing Information"**

"Notice of Missing Information" means the notice sent by the Claims Administrator to a Settlement Class Member who has submitted a Claim Form with incomplete or missing information that is required for the Settlement Class Member to be considered eligible for the class relief provided by this Settlement. "Review of Claims:"

"Settlement Class Members submitting completed Claim Forms shall be entitled to the relief identified in below unless the Claims Administrator has a good faith

belief that one or more required fields containing material fact(s) identified in the Claim Form is/are fraudulent or materially inaccurate. Within 60 days after the Claims Period ends, the Claims Administrator shall submit a report to Plaintiffs' Counsel regarding all claims made, the disposition thereof, and the basis for rejection of any claims. The Claims Administrator will also notify each Claimant whose Claim is rejected. Any Claimant whose Claim is rejected may seek reconsideration by contacting the Claims Administrator. Completed Claim Forms that are timely submitted to the Claims Administrator and to which the Claims Administrator does not believe are fraudulent or materially inaccurate, shall be deemed Accepted Claim Forms."

**Incomplete Claim Forms**

"Submitted Claim Forms omitting required information shall be returned via first class mail by the Claims Administrator to the Settlement Class Member's address indicated on the Claim Form as part of a Notice of Missing Information. Settlement Class Members whose Claim Forms are returned because of missing required information shall have until the end of the Claims Period, or 15 calendar days from when the Notice of Missing Information was mailed, whichever is later, to reply to the Notice of Missing Information and provide a revised Claim Form that includes all required information. If a Settlement Class Member fails to

respond by the end of the Claims Period or within 15 calendar days from when the Notice of Missing Information was mailed, whichever is later, or the Claims Administrator is unable to return the Submitted Claim Form as result of the omitted information, the Claims Administrator will not be obligated to make any payment on such claims."

Plaintiffs' Counsel and defendant again failed to include the following in the Stipulation of Settlement and it should be add in:

## RIGHT TO CHALLENGE

Both Defendant's Counsel and Class Counsel, the Parties and/or their representatives and the claimants shall have the right to challenge the acceptance or rejection of a Claim Form submitted by Class Members. The Settlement Administrator shall follow any agreed to decisions of Defendant's Counsel and Class Counsel. To the extent Defendant's Counsel and Class Counsel are not able to agree on the disposition of a challenge, the Special Master shall timely decide such challenge. The Parties agree that the Settlement Administrator shall thereafter follow the decision of the Special Master resulting from any such challenge.

 "Special Master" means an independent person to be agreed upon by the Parties or appointed by the Court to evaluate those Claim Forms submitted by purported

members of the Settlement Class the acceptance or rejection of which has been challenged by Defendant, Defendant's representative's or Class Counsel.

## X. MISCELLANEOUS PROVISIONS ISSUE

E. (page 32) of Stipulation of Settlement "This Agreement shall not be subject to collateral attack by any Settlement Class Member or any recipient of the notices to the Settlement Class after the Judgment is entered. Such prohibited collateral attacks shall include claims made before the Fairness Hearing that a Settlement Class Member failed to receive timely notice of the settlement or failed to submit a timely dispute letter for any reason."

Response: For the reasons stated above dispute letters should be accepted unless counsel fixes the issues by using the suggestions above.

The paragraph below is also missing from the Stipulation of Settlement

### Right To Respond To Objections

Class Counsel and defendant shall have the right to respond to any objection no later than seven (7) days prior to the Fairness Hearing. The Settling Party so responding shall file a copy of the response with the Court, and shall serve a copy,

by regular mail, email, hand or overnight delivery, to the objector (or counsel for the objector) and to counsel for Plaintiffs and Defendant.

**Defendant Cannot Respond To Any Objections Received**

Counsel, send the reply to this objector via email. Based on the objector's reading of the preliminary approval order referenced above and reviewing the Stipulation of Settlement, only Class Counsel have the right to respond to any objections received in this action, not the defendant. They did not request it in the order and there is no mention of it in the Stipulation of Settlement. Objectors object to allowing defendant to respond to any objections received. If a response is received the objectors request that the Court or its staff not view or strike it if one is submitted.

Why should it take up to 150 days after final approval for all checks to be sent out? Reduce that to 60 days maximum.

Paragraph 16 in the Stipulation of Settlement:

"The Court finds that the class notice is reasonable and constitutes due, adequate, and sufficient notice to all persons entitled to receive notice, and complies with the Due Process Clause of the United States Constitution."

Response: **Disagree.**

- What is the notice program and describe the methodology behind it.

- Counsels on both sides could have agreed to include a point of display publication notice at the big retailers that market said beverage advising them of the settlement but did not.

- Counsels could have included the publication notice on defendant's Facebook page along with posting it on the other social media listed below so their own customers know about the settlement but they did not, why not? To keep the claims rate low. The potential class members should be renoticed through the social media immediately by posting the Publication Notice on each site for thirty days and directing those using Twitter by sending a short "tweet" directing them to the website.

**45,346,435 Fans**

**269,164 Talking About This**

**1,780,470 Followers**

**583,966 Likes**

**3,869,563 Subscribers**

**90.2 Klout Score**

Instagram

The site www.RedBulletin.com  lifestyle magazine has a circulation of more than 3.1 million per month. The Publication Notice is not on there either and should be.

Stipulation of settlement 13 d (v): "valid shipping addresses for the Claimants selecting the Product Option." What does this mean? How is a class member supposed to know if they have **valid** shipping address when that definition is not addressed (pun intended) on the claim form? If they put down a PO Box is that valid or invalid address? This was not explained in the claims form or notice of stipulation and needs to be fixed.

Class Counsel could have required that defendant post the Publication Notice and website address of the settlement site directly to their customers by direct notice or email but chose not to.Some of the customers can be contacted directly via email made through their www.RedBullShop.com, website where all sorts of merchandise is available for purchase. Notice could be improved substantially. That's how the defendant successfully markets their product and events, though social media it, really works for them so it should work both ways with this settlement!

Counsel writes #23 in the Stipulation of Settlement:

"For avoidance of doubt, personal injury claims unrelated to the marketing or labeling of Red Bull Products will fall outside the scope of Released Claims.

Response: Not acceptable. Since this was also not in the Prilimanary Approval papers and not on the claim form for the class member to see and agree to, it doesn't count and needs to be removed.

The following paragraph was omitted from the or the Stipulation of Settlement so any new material information that is discovered after the stipulation of settlement was signed now has to be considered up to and including the date of the fairness hearing because newly discovered material information (like this objection) may dramatically change the course of the settlement and may impact the decision of the individual class member decision as to accept, opt-out or reject, accept the cash option or the product option in the proposed settlement.

**Binding Effect**

"The Settling Parties agree that they may hereafter discover facts in addition to or different from those they believe to be true with respect to the subject matter of this Agreement. The Settling Parties agree that, notwithstanding the discovery of the existence of any such additional or different facts that, if known, would materially affect its decision to enter into this Agreement, the releases herein given shall be and remain in effect as a full, final and complete general release of the Released

Claims and the Settling Parties shall not be entitled to modify or set aside this Agreement, either in whole or in part, by reason thereof."

**The parties included the following in the Stipulation of Settlement but failed to include the same paragraph in the claim form for the class members to see, read, and agree to when they autograph the claim form and date it. This should have been #4 on the claim form.**

"In connection with the Released Claims, each Settlement Class Member shall be deemed as of the Effective Date to have waived any and all provisions, rights, and benefits conferred by § 1542 of the California Civil Code and any statute, rule, and legal doctrine similar, comparable, or equivalent to California Civil Code § 1542, which reads as follows:"

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

The parties failed to disclose that they are releasing claims that the operative complaint did not allege. Class members should have to separately initial this 1542 release. Prior to the Final Approval Hearing, the Court should issue a tentative

ruling directing the parties to alter the agreement to remove the provision originally included which would expressly waive the provisions of California Civil Code § 1542 for the entire Settlement Class and the release of personal injury claims and make any changes necessary to fix the pointed out issues above and continuing below.

Counsels, the objector has determined that the removal of the 1542 release above is valued to the class at $18.5 million just like the $18.5 million value for the marketing and label changes the parties agreed to.

It appears that the **defendant** solely drafted the Stipulation of Settlement and not class counsel based on how one sided it is so objectors object to the content. It needs to be redrafted; the objector can assist with that issue as is being done throughout this objection.

### Missing From The First Page Of The Website:

"This website is authorized by the Court, supervised by counsel and controlled by GCG, the Claims Administrator approved by the Court. This is the only authorized website for this case."

**Missing From The Web Claim Form Page And Should Be Included As Soon As Possible:**

REMINDER CHECKLIST

1. Please sign the Proof of Claim.

2. If this claim is made on behalf of joint claimants, then both must sign.

3. Keep a copy of your Claim Form and all documentation submitted for your records.

4. Keep a copy of your proof of mailing if any is made like certified mail receipt.

5. The Claims Administrator will acknowledge receipt of your Claim Form by regular or electronic mail, within 60 days. Your claim is not deemed filed until you receive an acknowledgment postcard or e-mail (too late now). If you do not receive an acknowledgment postcard or e-mail within 60 days, please call the Claims Administrator toll free.

6. If you move, you must send us your new address. Otherwise, any funds allocated to your claim are subject to forfeiture.

7. Do not use highlighter on the Claim Form.

The following paragraph is missing from the preliminary approval document and the stipulation of settlement. Fix this and was it carried out?

## Cy Pres Program

Objector disagrees to any undistributed funds being donated to some unknown charity or institution that may or may not be linked to say class counsel's college or law school that makes class counsel or the defendant look good. Objector objects to the entire concept of cy pres. Another round of distribution is in order. After a second round of checks have been cashed take the remaining amount and give each class member $50.00 each based on a first to file and first to cash the check criteria or every 500th or 1000th check cashed, something. Get creative. No class damages are to go to non class members, period.

## Notice To State And Federal Officials Appears Missing

The CAFA notice appears missing from the motion for preliminary approval and stipulation of settlement. A paragraph like this should be included in the stipulation of settlement:

"In compliance with the attorney general notification provision of the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1715, within ten (10) days after the motion for Preliminary Approval is filed, Red Bull shall provide notice of this proposed Settlement to the Attorney General of the United States, and the attorneys general of each state or territory in which a Settlement Class Member resides. Defendant shall file with the Court a certification stating the date(s) on which the

CAFA notices were sent. Defendant will provide Class Counsel with any substantive responses received in response to any CAFA notice served by it. This needs to be done immediately if it's it not already been performed. Why weren't class members advised and directed to PACER or to go in person to any of the court's locations for more information about this case on the claim form and website?

**Missing Interest Into The Class Settlement Fund**

Defendant knows this is a weak settlement. By not depositing ANY money into the settlement fund until after approval is given shows lack of good faith and belief by both counsels that this settlement would/should be approved. There is no meeting of the minds in this settlement between defense counsel, Class Counsel and the class that this is a fair, reasonable and adequate deal and rightfully so. Plaintiffs' Counsel's decision not to require the entire amount be deposited up front has also caused the class to lose out on interest from July 31, 2014 to at least the Final approval hearing on May 01, 2014. In fact the settlement fund for should be for $13 million in cash and the product option value of $5.98 or less per four pack that is shipped out is then subtracted out from the fund. It's to defendant driven and biased the way it's set up right now.

That $4.5 million in cash could have accrued interest at .25% per year (Fed Fund

Rate) into the settlement fund. That is $16,250.00 per annum or $1,354.00 lost

interest per month to the class for every month until distribution which in this case

can be up to 150 days after approval. From July 31, 2014 to the date of the Final

approval Hearing the class lost out on $13,541.66 which should be taken out of

class counsel's fee (if any is ever awarded.) If we count forward 150 days after the

hearing add five more months at $1,354.00 each for a grand total of $20,311.66

which would pay an additional 20,311 class members $10.00 each or provide the

product option to an additional 3,286 damaged class members. ($20,311.66 divided

by $5.98 per four pack is the 3,286 additional four pack's.)


**A Showing Of Explicit Collusion Is Not Required To Demonstrate Settlement
Unfairness.**

This objection argues that the settlement is unfair in various aspects and is also a

product of explicit collusion based on the size of the attorney fees, incentive

awards and low settlement amount in this "wink, wink" settlement that is fee

driven first.  It violates section 23(h) because it is not "fair, adequate and

reasonable" within the meaning of Federal Rule of Civil Procedure 23(h) given

that class members are receiving less than $6.6 million dollars in cash and the

lawyers are receiving $4.5 million in cash. The product option is overvalued by

151%. The self-dealing here not only includes a disproportionate fee, but a clear
sailing agreement and a segregated fund for the proposed attorneys' fees that
would revert to the defendant here rather than the class. This unfairly insulates the
fee request from scrutiny and forces this objector to object to the settlement in
order to challenge the fee award, amongst the other issues.

The settlement contains unfair provisions; all in the defendant's favor that is why
the settlement and stipulation of settlement are one sided. This release and
settlement is defendant produced and our counsel let them have their way, any way
they chose, because of the $4,500,000.00 in undeserved fee promise. However,
demonstrating that a settlement lacks collusion does not thereby demonstrate that
the settlement passes muster. Lack of collusion is *necessary* for settlement
approval, but it is not *sufficient*. Courts "must be particularly vigilant not only for
explicit collusion, but also for more subtle signs that class counsel have allowed
pursuit of their own self-interests and that of certain class members to infect the
negotiations." *Bluetooth,* 654 F.3d at 947. An objector need not demonstrate
collusion to demonstrate an unfair settlement, for all it takes to make a settlement
unfair is a defendant's indifference to class counsel's self-dealing. *Staton,* 327 F.3d
at 964. *Bluetooth's* distinction between collusion and impermissible self-dealing is
at the heart of this objection: when the Rule 23(h) attorney award is too large

compared to the class' net award, this is evidence of self-dealing whether collusion is established or not.

**A Class Should Not Be Certified When The Primary Beneficiaries Are Class Counsel And Named Plaintiffs.**

Mathematically the number of claims will overwhelm the settlement fund and leave the vast majority of class members with no compensation. Class members are filing claims and being tricked into exercising their rights with misleading, incorrect, contradicting information and statements. The class would be better off if they each opted out and brought a small-claims case action and they would might get more than what most will receive, but we need some information from the class counsel as to what is the damage amount to each class member per can purchased and consumed first before that could even be considered by each class member. This is a *per se* breach of fiduciary duty and demonstrates the need for class decertification under Rules 23(a)(4) and (g).

**The incentive awards sought by representative named plaintiffs with Plaintiffs' Counsels endorsement may be excessive and may create a fatal conflict between lead plaintiffs and absent class members.**

Excessive payments to named class members can be an indication that the agreement was reached through fraud or collusion. See Staton v. Boeing Co., 327 F.3d 938, 975 (9th Cir. 2003). Indeed, "[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard." *Weseley v. Spear, Leeds & Kellogg,* 711 F. Supp. 713, 720 (E.D.N.Y. 1989); see also Women's Comm. for Equal Employment Opportunity v. Nat'l Broad. Co., 76 F.R.D. 173, 180 (S.D.N.Y. 1977) ("[W]hen representative plaintiffs make what amounts to a separate peace with defendants, grave problems of collusion are raised.").

The lead plaintiffs in this case appear to have taken potentially conflicting positions with absent class members as evidenced by the disparity in the requested "incentive awards."  An **average of $5,000.00 each  vs $10.00 or less each** may be just too much of a difference not to have unduly influenced the named class members into supporting such an obviously flawed proposed settlement with the interests of the unnamed class members an afterthought. In fact named plaintiffs have a dollar specific amount they are to receive and unnamed class members don't via the pro-rata rule! Class Counsel has so far failed to provide any credible legal and economic analysis justifying the awards; you better address this issue counsel.

Accordingly, this Court should carefully scrutinize whether the lead plaintiffs and their counsel are inadequate with respect to representing this class. The named plaintiffs are seeking to obtain windfalls that are grossly disproportionate to relief available to absent class members whom the named plaintiffs purport to represent. This type of approach is contrary to the protective requirements of Fed. R. Civ. P. 23, and well established public policy. In reviewing the requested "incentive awards," the Court should consider "the actions the named plaintiffs have taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert,* 42 F.3d 1004, 1016 (7th Cir. 1998).

Other factors to be considered (Objectors state, or when considering awards) include "the risk to the class representative in commencing suit, both financial and otherwise," (objectors state none) "the notoriety and personal difficulties encountered by the class representative," (objectors state none) the duration of the litigation, (short, there is no discovery, depositions and no protective order so the review of any information from the defendant was low level) and the personal benefit (or lack thereof) enjoyed *Vranken v. Atlantic Richfield Co.,* 901 F.Supp. 294, 299 (N.D. Cal. 1995).

In order for the lead plaintiffs or Plaintiffs' Counsel to be adequate, they must not

have interests which conflict with the unnamed class members. A class

representative's claims must not be inconsistent with those of the class. Global

Materials v. Superior Court, 113 Cal. App. 4th 836, 851 (2003) ; see also Lerwill v.

Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978), citing Nat'l Assoc.

of Reg'l Med. Programs, Inc. v. Mathews, 551 F.2d 340 (D.C. Cir. 1976); Herbert B.

Newberg & Alba Conte, Newberg on Class Actions § 3.73 (4th ed. 2002). By seeking

such inflated incentive awards and padded attorneys' fees and padded expenses, lead

plaintiffs and class counsel have put in writing their very own selfish interests ahead

of the absent class members they purport to represent. Accordingly, the Court should

apply heightened scrutiny to the entire negotiated settlement and nix it if dramatic

changes are not made to it by the parties. **The Court should require Plaintiffs**

**counsel to produce the retainer agreements for the objector and the Court to**

**review between class counsel and the named plaintiffs** as a condition for final

approval in light of the disparity between the proposed incentive awards and the class

benefit as a whole. These agreements bear directly on the adequacy of both parties

because they are discoverable. *See, e.g., Radcliffe v. Experian Info.*, 715 F.3d 1157,

1164–65 (9th Cir. 2013) (finding both class counsel and named plaintiffs inadequate

where fee agreement created conflict between the named plaintiffs, who would

receive incentive awards, and absent class members, who would not); *Porter v.*

*Nationscredit Consumer Disc. Co.*, 2004 U.S. Dist. LEXIS 13641, at *6–8 (E.D. Pa. July 8, 2004) (compelling plaintiff to produce documents concerning fee arrangements because "issues relating to the creation, maintenance, and management of class action suits are discoverable"); *In re Sheffield*, 280 B.R. 719, 722 (Bankr. S.D. Ala. 2001) (holding that defendant was entitled to fee agreements because they might reveal "potential conflicts or biases"). Did Plaintiffs' Counsel settle this for the fees because defendant would be happy to just get rid of the damages for pennies on the dollar in exchange for millions?  Maybe.

This is warranted given the disconnect between the relief the named representatives are eligible to receive in contrast with that accorded to ordinary class members. This disparity is both unseemly and striking and should cause the Court to be suspicious of the motives of the settling plaintiffs (e.g., were they promised anything pursuant to a retainer agreement which caused an irreconcilable conflict of interest between the named representatives, class counsel, and the rest of the class). *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. Cal. 2009).


## The Court Has A Fiduciary Duty To The Unrepresented Members Of The Class.

The district court must act as a "fiduciary for the class," "with a jealous regard" for the rights and interests of absent class members. In Mercury Interactive Corp., 618 F.

3rd 988, 994-95 (9th Cir. 2010) (quoting In re Washington Pub. Power Supply Systems Lit. 19 F. 3d 1291, 1302 (9th Cir 1994)). " Both the United States Supreme Court and the Court of Appeals' have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." In re Relafen Antitrust Litigation, 360 F. Supp 2d 166, 192-94 (D.Mass. 2005), citing inter alia Amchem Prods., Inc v Windsor, 521 U.S. 591, 617, 623 (1997) (Rule 239e) protects unnamed class members from unjust or unfair settlements' agreed to by "fainthearted" or self-interested class "representatives"'): Reynolds v. Beneficial Nat't Bank, 288 F. 3d 277, 279-80 (7th Cir. 2002) (district judges /are/ to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions" prior to settlement).


"The court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." In re General Motors Corp, Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55F. 3d 768, 785 (3d Cir. 1995) (quoting Grunin v International House of Pancakes, 513 f. 2d 114, 123 (8th Cir.1975)). A trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class."

The district court must ensure that the representative plaintiff fulfils his fiduciary toward the absent class members". There should be no presumption in favor of

settlement approval: the proponents of a settlement bear the burden of proving its fairness." True v American Honda co. 749 F. Supp. 2nd 1052, 1080 (C.D.Cal. 2010) ( citing 4 Newberg on Class actions $ 11:42 (4th ed 2009)). Accord American Law Institute, Principles of the Law of Aggregate Litig. $3.05 © (2010) (Ali Principies").

Concerns warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement." Hanlon v. Chrysler Corp., 150F. 3d 1011, 1021 (9th Cir. 1998); In Bluetooth Handset Prods. Liability Litig., 654 F. 3d 935, 947 (9th Cir. 2011).

## Public Policy Reasons Mean That the Court Should Not Infer Settlement Approval from a Low Number of Objectors

Any given class settlement no matter how much it betrays and cheats the interests of the class and unjustly makes overnight millionaires of class counsel in this case at the expense of the class; will produce only a small percentage of objectors. Sometimes just one good objection (like this one) can speak clearly for literally millions of unnamed Red Bull class members (including lawyers) who don't have the knowledge, skill, time, patience, experience or know how to spot an unfair settlement and deconstruct it to show the court how flawed it may be under its face. This

objection is written on behalf of the millions of Red Bull unnamed class members who can't put together an objection that can actually make a difference.

The predominating response will always be apathy, because objectors- unless they can use pro bono counsel, or do it themselves- must expend significant resources on an endeavor that may not benefit themselves directly. Another common response from non-lawyers will be avoidance whenever possible of anything related to lawyers and courtrooms. Class counsel may argue that this understandable tendency to ignore notices or free ride on the work of others. This is best understood as acquiescence in or evidence of support for the settlement. This is wrong. Silence is simply not consent. Grovev Principal Mut. Life Ins. Co., 200 F.R.D. 434, 447 (S.D. Iowa 2001) citing In re Gen Motors Pick-Up Litig., 55 F. 3d at 789.). "Silence may be a function of ignorance about the settlement terms or may reflect an insufficient of time to object."

As such, the response from class members cannot be seen as something akin to an election or public opinion poll. See In re Gen. Motors PickUp Litig,. 55 F. 3d at 813 (finding that "class reaction factor" does not weigh in favor of approval. even when low numbers of objectors in large class, when "those who did object did so quite vociferously') Thedore Eisenberg & Empericial Issues, 57 VAND .L. Rev. 1529, 1532 (2004).

A low number of objections and opt-outs isn't unusual. People seldom object; doing

so is a complicated process that requires understanding complex technical and legal

issues and investing significant time and effort. Most class members have no idea of

the legal consequences of opting out and fear losing a valuable benefit.

This from the 9th Circuit last year:

In (*Radcliffe v. Experian Information Solutions Inc.* (--- F.3d ----, C.A.9 (Cal.), May

2, 2013) The court of appeals held that the "incentive awards here in this case also

have corrupted the settlement by undermining the adequacy of the class

representatives and class counsel." The incentive awards changed the class

representatives' motivations. "Instead of being solely concerned about the adequacy

of the settlement for absent class members, the class representatives now had a

$5000.00 incentive to support the settlement regardless of its fairness …."

The Sixth Circuit recently reversed approval of two settlements where the disparity in

relief to class representatives versus absent class members made the settlement

unfair. First, in *Vassalle v. Midland Funding LLC*, 708 F.3d 747 (6th Cir. 2013)

consumers challenged robo-signing of affidavits in debt-collection actions. The

settlement provided class representatives with exoneration of their debt (*e.g.*,

forgiveness of a $4,516.57 debt owed by one class representative) to defendants as

well as $2,000 each in incentive awards. In contrast, absent class members would be

precluded from challenging the false affidavits in the debt collection action actions

brought against them, in exchange for what amounted to "*de minimis*" payments of $17.38.

Courts also recognize intra-class conflicts as an indication that a settlement is not reasonable at the final approval stage. See In re GM , 55 F.3d at 808. A "disparity in the relief afforded under the settlement to the named plaintiffs, on the one hand, and the unnamed class members, on the other hand, [makes] the settlement unfair." Vassalle v. Midland Funding LLC , 708 F.3d 747, 755 (6th Cir. 2013) (reversing district court's approval of a settlement). A court should reject a settlement where such an intra-class conflict is present on the grounds that it does not represent the "best possible recovery" for all putative class members.  In re Pet Food Prods. , 629 F.3d 333, 355 (3d Cir. 2010).

Second, in *In re Dry Max Pampers Litigation*, No. 11-4156, 2013 WL 3957060 (6th Cir. Aug. 2, 2013) the Sixth Circuit followed its reasoning in *Vassalle* to reverse approval of a consumer settlement involving diapers that allegedly tended to cause severe diaper rash. Class members were to receive $1,000 per affected child, while absent class members only benefited from the reinstatement of a one-box refund program of "dubious" value, and "illusory" benefits from labeling and website changes made by defendant. The Sixth Circuit held that the class representatives were inadequate, reasoning that when the settlement makes class representatives whole (or more than whole) while absent class members do not obtain adequate relief, the

representatives are encouraged to compromise the interests of the class for personal gain. The opinion concludes that the settlement is not fair because it "benefits class counsel vastly more than it does the consumers who comprise the class."

**Adequacy of Representation.**

The court must determine whether the representative plaintiffs can "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This requirement encompasses two distinct inquiries designed to protect the interests of absentee class members: [first,] it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees'[;] and [second] it tests the qualifications of the counsel to represent the class." *In re Gen. Motors*, 55 F.3d at 800 (citations omitted). "Adequacy" is especially important in classes certified for settlement purposes because "collusion, inadequate prosecution, and attorney inexperience are the paramount concerns in precertification settlements." *In re Gen. Motors*, 55 F.3d at 795 (citing *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968)). The second factor asks the court to determine whether "the plaintiff's attorney [is] qualified, experienced, and generally able to conduct the proposed litigation." *Wetzel*, 508 F.2d at 247.

The absence of conflicts is a central tenet of adequacy, and it applies to both representative plaintiffs and class counsel. *See, e.g., Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997) ("The adequacy inquiry under Rule 23(a)(4) serves to uncover

conflicts of interest between named parties and the class they seek to represent.");
*McCrary v. Elations Co.*, 2014 U.S. Dist. LEXIS 8443, at *36 (C.D. Cal. Jan. 13,
2014) ("The adequacy inquiry turns on . . . whether the named plaintiff and class
counsel have any conflicts of interest with other class members[.]").


**Does Any Counsel in This Litigation Ever Had or Have A Personal or Business
Relationship with Any Named Plaintiff?**

A close personal relationship "creates a present conflict of interest—an incentive for
[the named plaintiff] to place the interests of [class counsel] above those of the
class." *London v. Wal-Mart Stores*, 340 F.3d 1246, 1255 (11th Cir. 2003); *see also
Sippper v. Capital One Bank*, 2002 U.S. Dist. LEXIS 3881, at *7–8 (C.D. Cal. Feb.
28, 2002) (denying certification where class counsel and the named plaintiff were
business partners and had previously been joint defendants in a lawsuit). Fee
structures can also tell us something about adequacy. *SeeIn re Gen. Motors*, 55 F.3d
at 801-03 (discussing impact of fees and award settlements on adequacy
requirement). Attorneys' fees which are disproportionately large, or were negotiated
at the same time as the agreement, or are contingent on the agreement, may suggest
collusion or conflicts of interest. *Id.* at 803. Objector note that fees in this case were
tied into the material terms of the settlement as were the incentive awards to win the
named plaintiffs over even though it's clear to all the settlement has issues.

The class does not know if the named plaintiffs were involved in representing the best interests of the absent class members vigorously, but based on the numerous issues raised in this objection it doesn't look like it.  This indicates that plaintiffs did not meet the applicable criteria and did not "fairly and adequately protect the interests of the class." *See* Fed. R. Civ. P. 23(a)(4); *see also Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 619-20 (1997) (the existence of a proposed settlement is relevant to class certification, including whether absent class members' interests are being adequately represented).

The Federal Rules of Civil Procedure require, upon certification of the class, that "the best notice that is practicable under the circumstances" be given, "including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c) (2) (B). The Federal Rules of Civil Procedure further require, upon the successful negotiation of a proposed settlement, that notice be given "in a reasonable manner to all class members who would be bound by the proposal." Fed.R.Civ.P. 23(e)(1). The Due Process Clause requires that notice be "reasonably calculated to reach potential class members." *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 203 (D.Me.2003); *see also Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 174, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 315, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Again very little has been done by counsel to notice possible class

members correctly using available social media that the defendant already uses
successfully when marketing itself and its product.

## Suggested Attorney Fee

If the Court does approve eventually approve the settlement, the fee request should be
reduced to far less than counsel wants to date based on all the issues above. Objector
will wait to comment in detail until after counsel files its final papers.

The ultimate question to be resolved is this:

Has Plaintiff's Counsel proved that the $13 million is fair, reasonable and adequate to
the class based on the evidence and that the case should be settled as is?  Objector
says no they have not, yet.

## Deny Motion to Certify

Wherefore, this objector respectfully requests that the Court withdraw its conditional
approval of the proposed settlement and enter orders requiring further proceedings so
as to affect substantial justice in this cause between the parties and the absent class
members. The Court should rule that the class cannot be certified pursuant to Rule
23(a)(4), and sustain these objections because the proposed settlement at this time  is
unfair, unreasonable, inadequate and not in the public interest because of all the
issues stated in this objection which all the evidence backs up and is irrefutable.

Objectors ask the Court to not enter a "Final Judgment" granting final approval of this Agreement under Rule 23(e) of the Federal Rules of Civil Procedure and no entry of a final judgment under Rule 58 of the Federal Rules of Civil Procedure.

To approve this settlement, as is, would be in this objector's opinion a mistake of law, clearly an erroneous factual finding as well as arbitrary and capricious. Class counsel may have breached their fiduciary duties by leaving huge amounts of money on the table.

The Settlement Class should not be certified for Settlement Purposes, Plaintiffs not Re-Appointed as Class Representatives, Plaintiff's Counsel not Re-Appointed as Class Counsel. The Proposed Settlement Class Does Not Meet All the Requirements of Rule 23(a).

## CONCLUSION:

Class Counsel and Defendant are using the court's power to rush through what they know to be a flawed settlement with a lot of unanswered questions as to how it was handled from the start to the conclusion. The defendant wants out of this lawsuit for as little money as possible and to keep the claims and publicity low which Class Counsel is more than happy to agree to for the $4,500,000.00 fee. This settlement was designed to create some sort of record from which both sides can claim, "this is the best we can do." It's nowhere near the best they can do. They want to take the

money and head to a warm beach for a huge party that the class is paying for and we are not even invited to! It is nowhere near the best they could do for the class, maybe for themselves, but not the class.

The issues the objector has addressed which no other class member is aware of, should be reviewed and corrected as best as possible prior to any approval hearing. Presently, this proposed settlement is not ready for a prime time approval because it is unfair, unreasonable, inadequate, not in the public interest, violates due process under the Constitution and needs to be rejected or modified to fit Rule 23 requirements.

Counsel on both sides are all very capable of putting a distorted record in front of the class and court that would lead the court down a predetermined path so as to reach a predetermined conclusion and result that they want the court to reach at the expense of the class members. This is not about truth and justice, right or wrong but winning and losing with the lawyers winning and the class the biggest losers. The $13 million in value settlement is insufficient, it's tin cup and pan handle change for the class but the fee to counsel is anything but. The class requires more benefits.


There are a total of nine sentences below out of the seventeen pages that are highlighted in **bold** that quote the owner about alleged scientific studies and

performance enhancing qualities of the product that apply to this case and proposed settlement from an article written a few years ago. They are the same excerpts described above earlier in the objection on pages 22 and 23 in case the Court is not interested reading the entire article.

From Bloomberg Businessweek

http://www.businessweek.com/magazine/content/11_22/b4230064852768.htm

## Red Bull's Billionaire Maniac

By Duff McDonald May 19, 2011

*(Corrects Sports Illustrated's paid circulation in fourth paragraph.)*

Little known outside of his native Austria, Dietrich Mateschitz is one of the most successful entrepreneurs of our age, a man who single-handedly changed the landscape of the beverage industry by creating not just a new brand but a whole new category: the energy drink. As the visionary who brought the world Red Bull, affectionately known as "speed in a can" or even "liquid cocaine," Mateschitz, 67, has been a patron saint for more than two decades to late-night partiers, exam-week undergrads, long-haul truckers, and, above all, extreme-sports athletes everywhere.

In return for his sickly sweet innovation, the world has made him very, very rich. Last year the privately held company, also named Red Bull, says it sold 4.2 billion cans of its drink, including more than a billion in the U.S. alone. That represents a 7.9 percent increase over the year before, and revenues jumped 15.8 percent to $5.175 billion. Mateschitz runs an efficient enterprise that has yet to trip on its rapid growth: At the end of 2004, he had just 2,605 employees; in 2010, Red Bull employed 7,758 people - which works out to more than $667,000 in revenue per person.

Now he's set his sights on media. On May 15, subscribers to the *Los Angeles Times, Chicago Tribune, Miami Herald, Houston Chronicle,* and *New York Daily News* found a magazine called *Red Bulletin* inserted in their Sunday papers. The 98-page glossy features a cover story on San Francisco Giants ace Tim Lincecum, as well as pieces on Bob Dylan, graffiti art, and Russian BASE jumper Valery Rozov. Billed as "an almost independent monthly," the magazine is a product of Red Bull Media House, a subsidiary media company launched in Austria in 2007 that expanded with a Los Angeles outpost this January.

Red Bull knows what it's getting into. Over the years, it has produced TV programs (*No Limits* on ESPN), films (*That's It, That's All*), magazines, a website, and a steady diet of Web videos featuring snowboarders, rally cars, surfers, cliff divers,

and concerts. Even so, its current ambitions reflect a serious ramping up, as well as the realization of a business plan that eschews conventional advertising in favor of marketing through its own events, shows, and publications. The company shipped more than 1.2 million copies of the first *Red Bulletin* in the U.S. (about one-third of *Sports Illustrated's* paid circulation). This fall its first feature-length documentary, a look at snowboarding called *The Art of Flight*, will be released in U.S. theaters. Earlier this year, the company announced a partnership with Bunim/Murray Productions, best known for creating the *Real World* reality-show franchise on MTV. The two are working on reality TV concepts for Red Bull athletes.

Mateschitz calls the multimedia assault "our most important line extension so far. As a major content provider, it is our goal to communicate and distribute the 'World of Red Bull' in all major media segments, from TV to print to new media to our music record label." He hopes Red Bull Media House will turn a profit, but, as with his sports teams, he's willing to wait. "In literal financial terms, our sports teams are not yet profitable, but in value terms, they are," he says. "The total editorial media value plus the media assets created around the teams are superior to pure advertising expenditures."

Red Bull has employees in 161 countries, but most of the major decisions still get

made either at Red Bull's headquarters in Fuschl, an Austrian village of 1,500, or at Hangar-7, Mateschitz's private airplane complex a few minutes outside Salzburg.

Though he rarely gives interviews, Mateschitz's Hangar-7 provides ample evidence that he is not shy about his success. Each of his buildings features architectural flourishes that seem better suited to a design mecca like Berlin than to a bucolic Austrian suburb. "The architect almost killed me when I told him I wanted to add that," says Mateschitz, standing on a balcony and pointing straight up at the Threesixty Bar—a circular all-glass room that appears to be suspended in mid-air. It's extravagant, unnecessary perhaps, and that's precisely the point. "It wouldn't be Red Bull if it didn't start harmless and end up as a catastrophe," Mateschitz says. "And architects are really only paid discussion partners anyway."

Beyond the Flying Bulls—a performing fleet of vintage aircraft—the most fascinating parts of Hangar-7 are the restaurants, including the Threesixty Bar, the Mayday Bar, and Restaurant Ikarus. Directly below us sit a half dozen aircraft, all tattooed with Red Bull's logo, including a Chance Vought F4U-4 Corsair fighter from 1945, a Pitts S2B aerobatic biplane, two Alpha jets once used by European militaries for training, and a couple of helicopters.

Mateschitz owns four soccer teams: New York's Red Bulls (and their stadium), Red Bull Salzburg, Red Bull Brasil, and RB Leipzig. He also has a Nascar team

and two Formula 1 racing teams. One Formula 1 team has on occasion been sufficient to cripple a billionaire's finances, but like everything at Red Bull, he finances the annual $200 million cost of his F1 teams out of the company's healthy operating income.

Mateschitz is Austria's richest man, and Red Bull is the biggest thing to come out of the place since, well, Arnold Schwarzenegger. California's former governor has an idea why Mateschitz is so successful: "He's a daring businessman, but he's also quite visionary for an Austrian, because he thinks in terms of the whole world. It's one thing to think that way in America, but it's much more rare when you come from a small country like Austria."

Mateschitz's private office is called Lucky 7-Private Heaven. It's so private that we're forced to wait as he struggles to get the digital fingerprint reader to grant him access. It's the one time all day that he shows even an inkling of uncertainty. "I'm not really this James Bond," he says as he places his finger on the reader for the third time. "It was for my son when he was younger. But he was a little surprised when I told him that it only worked with my fingerprint and not his as well."

Once inside, Mateschitz takes his place behind a modern wooden desk that holds not a computer but rather a model plane, a bronze sculpture of two bulls flying on an eagle's wings, and a few coffee-table books—on the Belgian artist Panamarenko

and the German aeronautical engineer Claude Dornier— and launches into a spiel he's been delivering for the past 25 years. **In near-perfect English, he explains that Red Bull is not just a drink. Instead, it is a "philosophy"—one seemingly derived from his own outlook on life—and a "functional product," used to improve strength and performance and to revitalize the body and mind.** An amiable man, Mateschitz is also quite serious, prone to beginning sentences with the phrase "It is a must." As in: "It is a must to believe in one's product. If this were just a marketing gimmick, it would never work."

He says it with such certainty that it's easy to forget that Red Bull is just a carbonated drink in an artfully designed eight-ounce can, the main ingredients of which are caffeine, an amino acid called taurine, and a carbohydrate called glucuronolactone.

**Mateschitz was born on May 20, 1944**—under the sign of Taurus, naturally—in the village of St. Marein, in Austria's southern region of Styria. His family was predominantly conservative, full of officers, priests, and teachers—the profession of both his parents.

From an early age, Mateschitz showed an aptitude for selling an idea, like the time he persuaded his mother to let him attend university in Vienna rather than in nearby Graz. "I chose the university for the city, not for the university," he says. "But I could only find one course which wasn't available in Graz, which was ship construction. So I convinced her that I had only one desire in life, and that was to become a ship engineer."

It took him 10 years to get a degree in commerce from the Vienna University of Economics and Business, and he spent part of that time working as a ski instructor to pay the bills. After graduating, at 28, he spent 10 years as the international marketing director of a German consumer products company called Blendax. He was little more than a glorified toothpaste salesman, and by 38 he'd hit a wall. "All I could see was the same gray airplanes, the same gray suits, the same gray faces. All the hotel bars looked the same, and so did the women in them. I asked myself whether I wanted to spend the next decade as I'd spent the previous one."

A chance trip to Thailand in 1982 would prove to be the turning point in Mateschitz's life. Curious to know what attracted the locals to an uncarbonated "tonic" called Krating Daeng (Thai for "water buffalo"), he tried some himself and found that it instantly cured his jet lag. Not long after, while sitting in the bar at the Mandarin Oriental in Hong Kong, he read in a magazine that the top corporate

taxpayer in Japan that year was a maker of such tonics. Suddenly, the idea hit him: he would sell the stuff in the West.

In 1984, Mateschitz approached one of his Blendax contacts, Chaleo Yoovidhya, a Thai businessman who was selling the tonic in Southeast Asia, and suggested that the two introduce the drink to the rest of the world, with one crucial change: It would be carbonated. Yoovidhya liked the idea, and they agreed to invest $500,000 apiece to establish a 49/49 partnership, with the remaining 2 percent going to Yoovidhya's son. (Yoovidhya remains a silent partner in the company.) Mateschitz then returned to Austria to plan the all-important packaging and slogan. For help, he turned to his university friend Johannes Kastner, who owned his own ad agency in Frankfurt.

"He said he had no money, so we agreed that he would do freelance work for me to pay me for it," says Kastner. Over the next year and a half, Kastner and his team put together about 50 different designs for Red Bull, with Mateschitz finally deciding on the distinctive blue-and-silver can emblazoned with the logo of two muscular bulls about to smash heads in front of a yellow sun. A slogan was harder to come by. "Nothing satisfied him, and I was finally so upset that I told him to find another agency," says Kastner. "He asked me to think about it for one more

night. And at 3 a.m. it came to me- -'Gives You Wings.' I called him right then and told him it was the last one I'd give him, but he said, 'That's it.'"

It was just what Mateschitz needed—something to convey that Red Bull had tangible effects. That, in turn, would allow his product-positioning master stroke: He would sell Red Bull as an ultra-premium drink in a category all its own. **At about $2 a can, it was far-and-away the most expensive carbonated drink on the shelves. "If we'd only had a 15 percent price premium, we'd merely be a premium brand among soft drinks, and not a different category altogether," says Mateschitz.** In 1987 he introduced the drink in Austria. Next came Hungary, the U.K., and Germany, and before long sales were spiking all over Europe.

At this point most histories of Red Bull tend to depart from Mateschitz and focus on Red Bull itself, which is exactly how he wants it. A curious hybrid of a mogul, Mateschitz has a zest for life that rivals Richard Branson's, but his obsession with controlling information puts him closer to Steve Jobs. Like the Apple (AAPL) chief, Mateschitz pulls the strings behind a consumer cult. And cults rely on message control.

While he's engaging in person, Mateschitz is notoriously secretive. (His elusiveness has prompted his staff to nickname him The Yeti.) He has a long-standing policy of refusing to discuss his private life, and until recently he wouldn't

even consider answering questions about his only child, Marc, whose mother is a

schoolteacher Mateschitz dated for two years.

He's close to some of Austria's most prominent people, though Mateschitz says he

doesn't place a premium on collecting friends or socializing: "I don't believe in 50

friends. I believe in a smaller number. Nor do I care about society events. It's the

most senseless use of time. When I do go out, from time to time, it's just to

convince myself again that I'm not missing a lot." On those rare occasions,

however, he invariably arrives with an attractive woman on his arm. "It's just that

I'm not old and wise enough to be married yet," he says. "But is it necessary that

you write about this?"

**The success of Red Bull defies logic** in one important regard: It doesn't taste very

good. The amber-colored elixir's taste has been likened to "liquid Sweet Tarts" or

"cough medicine in a can." (Although it does grow on you.) One early market

research report in the U.K. put it bluntly: "No other new product has ever failed

this convincingly." **Mateschitz says he didn't care about the taste issue then,**

**and he doesn't care about it now. "It's not just another flavored sugar water**

**differentiated by color or taste or flavor," he says. "It's an efficiency product.**

**I'm talking about improving endurance, concentration, reaction time, speed, vigilance, and emotional status. Taste is of no importance whatsoever."**

But if Red Bull doesn't please the palate, what exactly does it do for you? The short answer is that no one outside of Red Bull is entirely sure. There's the caffeine content: 80 milligrams per can, twice that of a can of Coca-Cola (KO) and about the same as a cup of coffee. Those drinking original Red Bull and not the sugar-free version also receive a healthy dose of carbohydrates. But the rush Red Bull delivers is different from what you'd feel after drinking a coffee or two cans of Coke.

Enter the "crucial" ingredient: taurine, an amino acid found in meat, eggs, and human breast milk. While some studies have shown small doses of taurine to be beneficial against problems ranging from epilepsy to cardiac arrhythmias, there's scant evidence of its impact on the body, positive or negative. A "nonessential" amino acid, it's manufactured from other amino acids in the liver, and scientists say it's therefore unnecessary to a healthy diet. **But Mateschitz scoffs at this. "We have meters and meters of scientific evidence and support" showing its benefits, he says.**

The company has shared the results of these studies with health authorities each time it has sought to enter a new country, and most governments have approved the

drink for sale. It was banned, for a time, in both Denmark and France, where authorities were focused not on Red Bull's benefits but on the potential danger posed by its unusually high levels of taurine, caffeine, and certain B vitamins. In 1991 two young Swedes died on a night when they'd drunk Red Bull with vodka, and in 1999 an Irish teen who had consumed three Red Bulls died while playing basketball. Although investigators found no connection between the deaths and Red Bull, the cases raised alarms, as did a French study in which rats that had been fed taurine were found to exhibit bizarre behavior, including self-mutilation. Still, the data on taurine remains inconclusive.

Mateschitz proved his marketing genius, especially in an era of "crisis management," with his early decision to foster rumors about Red Bull's content instead of trying to quash them. In the early 1990s, when the drink emerged as a hit in the infamous all-night party circuit on the Spanish island of Ibiza, tales began to circulate that taurine was derived from bull testicles or even bull semen. The company let the gossip travel unchecked, and even set up a page devoted to the rumors on its website. "In the beginning, the high-school teachers who were against the product were at least as important as the students who were for it," says Mateschitz. "Newspapers asked, 'Is it a drug? Is it harmless? Is it dangerous?' That ambivalence is so important. The most dangerous thing for a branded product is low interest."

Was it all by design? Did he really anticipate that a combination of rumor and public outcry would play such a big part in driving early sales? Mateschitz is emphatic: "Yes. We expected it. It was a part of the strategy from the beginning. We would make the brand interesting enough that people wanted to get their hands on it."

**Controversy aside, the central pillar** of Red Bull's marketing campaign has always been its claim that it can improve athletic performance. To prove it, the company took a page out of Gatorade's (PEP) book and targeted athletes, except that, in a timely twist, Mateschitz zeroed in on the extreme-sports crowd. The first athlete he signed up to be an "ambassador" was fellow Austrian Gerhard Berger, winner of 10 Formula 1 races. In short order, Red Bull was sponsoring events and athletes in a variety of perilous endeavors.

Today, Red Bull underwrites more than 500 athletes in 97 sports—100 of them in the U.S. But in a departure from the traditional sponsorship arrangement, Red Bull doesn't offer its athletes contracts, just a verbal agreement to "support" them in achieving their dreams. Some of those athletes don't need any "support" per se— Red Bull counts soccer star Thierry Henry and snowboarder Shaun White as part

of its "family"—but some, like Canadian ice-climber Will Gadd surely welcome the extra bucks.

The sports Red Bull tends to focus on are definitely not for the faint of heart. In the last 20 years, three Red Bull athletes—whom Mateschitz calls "family members"—have died in separate incidents: Shane McConkey and Ueli Gegenshatz (BASE jumpers) and Eli Thompson (Red Bull Air Force). "There are almost no sports within which mortal accidents are not a reality," Mateschitz says. "The sports they helped pioneer carry inherent risks which each would take with or without our support. And while we were hit hard by it and deeply concerned, they chose their journey long before we met."

Felix Baumgartner, the world's best-known BASE jumper, is in Mateschitz's inner circle, and his association with the company dates back to 1996. (BASE is an acronym for the fixed objects from which such athletes usually jump: Building, Antenna, Span—or bridge—and Earth.) Red Bull sponsors most of Baumgartner's stunts, such as a 120-foot leap from the arm of the Christ the Redeemer statue in Rio de Janeiro in 1999 that set the record for the lowest parachute jump in history. Baumgartner later admitted to Jay Leno that the idea sounded stupid. Leno replied, "It doesn't sound stupid. It is stupid."

Like everything else at Red Bull, the negotiations that lead to sponsorship deals are unorthodox as well. Windsurfer Robby Naish recalls his first meeting with Mateschitz almost 20 years ago. "We talked in the courtyard of his office in Fuschl, and pretty soon realized that we're both really into cars. That was the end of our business meeting, because he wanted to show me his Ferrari GTO. We went driving off into the mountains, and after 15 minutes he pulled over, got out, and told me to drive back. I didn't want to—it's a million-dollar car - but he said I was either going to drive the Ferrari or walk back. I was so scared, I drove like my grandmother."

The lines between Red Bull, Red Bull athletes, and Red Bull events are blurry on purpose. To Mateschitz, it's just one big image campaign with many manifestations. Americans might see 2005 Heisman Trophy winner Reggie Bush on television wearing a Red Bull hat. Or they might stumble on a YouTube video of Shaun White secretly training on the private half pipe built by Red Bull. Or they might actually attend one of dozens of global Red Bull events, like the May 21 Red Bull Soapbox Race in Los Angeles or a motocross spectacular in Brazil the week after. This is fun stuff, and it's a lot more interesting than writing a check to buy 30 seconds during the Super Bowl.

Despite the fact that he's approaching 70, Mateschitz maintains quite a clip. He still moves like an athlete, rides horses, pilots planes, and last year competed in an off-road motorcycle race. He has, however, installed a board of directors at Red Bull to work on broader strategic issues. Red Bull now has hundreds of competitors (the latest entrant: Tiger Blood energy potion, an homage to Charlie Sheen). For a time, there were rumors that Coca-Cola had offered to buy the company, but those have died down. Mateschitz has long insisted that he has no plans to sell or take Red Bull public. "It's not a question of money," he says. "It's a question of fun. Not only that, can you imagine me in a shareholders' meeting?"

The bigger question is whether the juggernaut he has built will survive him, factoring in that Red Bull is the vehicle for his passions and ideals. Mateschitz thinks so. And he even has a successor in mind. "My 19-year-old son will join the company after finishing his studies, if he wants to and if the time is right," he says.

Meanwhile, Mateschitz has certainly created some enviable havens for himself. Like Richard Branson, he has his own private island, the 3,000-acre Laucala, in Fiji. The flamboyant Malcolm Forbes bought the island for $1 million in 1972. Mateschitz heard about it from his friend George Harrison, the ex-Beatle, who had planned to buy the island himself before his death. In 2003, Mateschitz purchased it for a reported $10 million.

Laucala was first sighted in 1789 by Captain William Bligh of the *HMS Bounty* after he'd been relieved of his duties and set adrift by his mutinous crew. Mateschitz plans to use it mainly as a getaway for his small circle of friends, but he has also built an exclusive resort on the island. When I ask him what motivated him to buy a vacation home so far from Salzburg, he resorts to quoting Forbes himself: "He gave a nice answer, which was, 'Doesn't everybody want their own South Pacific island?' Well, in my case, he was right. I did." He also says that he has always been attracted to the idea of having his own independent state—the country of Red Bull, as it were—which would have the shortest set of laws in the world. "The rules would be simple. Nobody tells you what you have to do—only what you don't have to do."

McDonald is a *Bloomberg Businessweek* contributor.

---

©2014 Bloomberg L.P. All Rights Reserved. Made in NYC Ad Choices

*Christopher Andrews, objector, Pro se*

P.O. Box 530394

*Livonia, MI 48152-0394 E-mail caaloa@gmail.com Phone 1-248-635-3810*

Case 1:13-cv-00369-KPF   Document 72   Filed 04/21/15   Page 81 of 84

Page 81 of 84



Christopher Andrews

*I certify* under penalty of perjury in accordance with 28 U.S.C. § 1746, that *the above*

*and below information is true and accurate to the best of my knowledge*, information,

and belief. *Any emails, notices or docket filings filed with the court can be sent to*

*the objector at the email address listed above.*

Christopher Andrews

*I hereby certify* pursuant to 28 U.S.C. § 1746, *under penalty of perjury that the*

*above and below information is true and accurate to the best of my knowledge*,

information, and belief.

On this day December 01, 2014  I sent the foregoing to the Clerk of the Court, and

served true and correct copies upon class counsel and defendants' counsel via US

Post Office Priority Mail  (two- three day delivery) at the addresses below, per the

instructions of the Settlement Notice to:


Clerk of Court, the United States District Court

ι or the Southern District of New York

500 Pearl Street

New York, NY 10007-1312

Morelli Alters Ratner, LLP

Benedict P. Morelli

777 Third Avenue,

31st Floor

New York, NY 10017

Morelli Alters Ratner, LLP

Jeremy W. Alters

Miami Design District

4141 Northeast 2nd Ave., Suite 201

Miami, FL 33137

Kaplan Fox & Kilsheimer LLP

Laurence D. King

Linda M. Fong

350 Sansome Street, Suite 400

San Francisco, CA 94104

Kaplan Fox & Kilsheimer LLP

Frederic S. Fox

850 Third Avenue, 14th Floor

New York, New York 10022

Kaplan Fox & Kilsheimer LLP

Justin B. Farar

11111 Santa Monica Blvd, Suite 620

Los Angeles, CA 90025

Skadden Arps Slate Meagher &

Flom LLP

Jason D. Russell

Hillary A. Hamilton

300 S. Grand Ave. Suite 3400

Los Angeles, CA 90071

Skadden Arps Slate Meagher & Flom LLP

Kenneth A. Plevan

Four Times Square

New York, NY 10036


Benjamin Careathers, Vs.Red Bull North America, Inc.,

Case No.1:13-cv-00369-KPF

And David Wolf and Miguel Almaraz Vs. et al. v. Red Bull GmbH,et al.

Case No. 1: 13-cv-080008-KPF