UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BENJAMIN CAREATHERS, individually, and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>  vs.<br><br>RED BULL NORTH AMERICA, INC., a California Corporation,<br><br><br><br>      Defendants. | Civil Action No. 1:13-CV-0369 (KPF) |
| DAVID WOLF and MIGUEL AMARAZ, individually and on behalf of others similarly situated,<br><br>      Plaintiff,<br><br>  vs.<br><br>RED BULL GMBH, a foreign company; RED BULL NORTH AMERICA, INC., a California Corporation; and RED BULL DISTRIBUTION COMPANY, INC., a Delaware corporation,<br><br>      Defendants. | Civil Action No. 1:13-CV-08008 (KPF) |

**MEMORANDUM OF LAW IN SUPPORT OF OBJECTOR THEODORE H. FRANK'S MOTION TO EXCLUDE REPORT OF ROB FRANKEL**

**SUMMARY OF ARGUMENT**

In support of their Motion for Attorneys' Fees (Dkt. 63) class counsel submit the report of branding consultant Rob Frankel, which purports to calculate the value of the changes in Red Bull's advertising practices that comprise the injunctive component of the Proposed Settlement. Valuing

Frank Motion to Exclude the Report of
Rob Frankel
Case No: 1:13-cv-00369 (KPF)     1

the Injunctive Relief for Red Bull, Dkt. 64-5 at 3 ("Frankel Report"). The report consists of conclusory analysis unrelated to the actual valuation of the injunctive components of the Settlement and unsupported by any empirical evidence. It therefore violates Fed. R. Evid. 702 and 703 and the principle of *Daubert v. Merrell Dow Pharmaceuticals, Inc.* that the reasoning and methodology of any proffered expert testimony must be reliable and must properly apply to the facts at issue. 509 U.S. 579, 593 (1993). The Objector therefore respectfully requests that the Frankel Report be excluded from consideration as it is unreliable, unscientific and untethered to the facts of this case. It should also be excluded for the independent reasons that it is unsworn hearsay, *Brown v. Thomas*, 771 F.3d 1001, 1006 (7th Cir. 2014) (Posner, J.), and does not comply with the requirements of Fed. R. Civ. P. 26(2)(B).

## ARGUMENT

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.* the Supreme Court developed a test for limiting the admission of purportedly expert scientific testimony under Rule 702 of the Federal Rules of Evidence to ensure that it is "supported by appropriate validation—*i.e.,* 'good grounds,' based on what is known." 509 U.S. 579, 590 (1993). *Daubert* held that a district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology *properly can be applied to the facts in issue.*" *Id.* at 593 (emphasis added); *see also Faulkner v. Nat'l Geographic Soc'y*, 576 F. Supp. 2d 609, 619 (S.D.N.Y. 2008) (listing the factors to be considered under *Daubert* and its progeny). "The objective of [the gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). In *Kumho*—a products liability case involving a blown tire and an expert in tire failure analysis—the Court extended *Daubert* to cases of "technical" rather than purely "scientific" testimony. 526 U.S. 137, 141 (1999). *Kumho* explained that the test for the admissibility of the testimony was not whether

the tire expert's limited visual and tactile inspection methodology was "reasonable[] in general" but whether "it was [reasonable to] us[e] such an approach . . . to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant." *Id.* at 153-54. That is to say, there must be a "fit" between the expert's methodology and the facts of the case. In *Kumho* "the relevant issue was whether the expert could reliably determine the cause of th[e] tire's separation," i*d.* at 154, and the Court "found no indication that…tire experts…normally make the very fine distinctions…that were necessary…to support his own theory." *Id.* at 157. The Court thus affirmed the exclusion of the testimony.

In class actions, *Daubert* applies at the class certification stage to the extent that a party relies on expert testimony because "rigorous" Rule 23 scrutiny is necessary to protect the rights of absent class members. *See In re Blood Reagents Antitrust Litig.*, __F.3d__, 2015 U.S. App. LEXIS 5630 (3d Cir. Apr. 8, 2015) (citing *inter alia Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) and *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)). *See also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996) ("A district court certainly may look past the pleadings to determine whether the requirements of [R]ule 23 have been met. Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues").

Regrettably, the Frankel Report is the prototypical effort in class action settlements to estimate the value of inestimable injunctions; it does nothing to serve the interest of the class and everything to serve the interest of class counsel. *See, e.g., In re Oracle Secs. Litig.*, 132 F.R.D. 538, 544-45 (N.D. Cal. 1990) (Walker., J.) (referring to injunctive relief "expert valued at some fictitious figure" coupled with "arrangements to pay plaintiffs' lawyers their fees" to be the "classic manifestation" of the class-action agency problem); *Pearson v. NBTY, Inc.,* 772 F.3d 778, 786 (7th Cir. 2014) (finding comparable report "too shallow to be admissible as evidence"); *In re LivingSocial Mktg. & Sales Practices Litig.*, 298 F.R.D. 1, 17 n.16 (D.D.C. 2013) (rebuking a $54 million valuation of injunctive relief as "of marginal value" and noting that "the Court is unable to assess the reliability of

the report."). "Precisely because the value of injunctive relief is difficult to quantify, its value is also easily manipulable by overreaching lawyers seeking to increase the value assigned to a common fund." *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003); *In re Excess Value Ins. Coverage Litig.*, 598 F. Supp. 2d 380, 387-88 (S.D.N.Y. 2005) (same).

Conclusory expert opinion testimony is inadmissible under Second Circuit law. *Major League Baseball Properties v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008); *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 142 (2d Cir. 2000). It is appropriate even to exclude the testimony of a Nobel Prize winner if his or her underlying methodology is unreliable. *In re Brand Name Prescription Drugs Antitrust Litigation*, 1999 U.S. Dist. LEXIS 550 (N.D. Ill. Jan. 19, 1999) (excluding testimony of Nobel Prize-winning economist Robert Lucas when opinions not based on evidence), *aff'd on other grounds*, 186 F.3d 781 (7th Cir. 1999); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (stating "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

The Frankel Report purports to value the changes in Red Bull's advertising practices that comprise the injunctive component of the proposed settlement. Dkt. 64-5 at 3. This Report exemplifies the sort of expert testimony at issue in *Kumho*: even if vaguely illuminating as to general principles of branding, it cannot reasonably be relied upon to form "a conclusion regarding the particular matter to which the expert testimony [is] directly relevant"—namely, the appropriate valuation of this settlement's injunctive relief. Like the visual and tactile analysis of the tire expert in *Kumho*, most of Mr. Frankel's methodology amounts to cursory examination of some general features of Red Bull's branding. This sheds no light on his ultimate, highly precise conclusion—that the ultimate value of the injunctive relief should be 1.4% of Red Bull's revenue for the years in question. Frankel Report at 3. This figure derives wholly from a comparison to a single prior class action against Taco Bell, and he supports it, not with his own analysis or investigation, but by excerpts from lay newspaper articles. *See Virgin Atl. Airways v. British Airways Plc*, 257 F.3d 256, 264 (2d Cir. 2001) (affirming disavowal of expert testimony that did not use the right comparators); *In re*

*Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) ("[C]ourts have excluded expert testimony "where the expert selectively chose his support from the scientific landscape.").

The Frankel Report opens with its only verifiable assertion—that Red Bull led the energy drink category in market share. *Id.* at 5. (This claim is supported by an Appendix which shows Red Bull's market share between the years 2006-2011. *Id.* at 25). As the Report itself states vaguely at the outset, "[l]osing its health claim advantage no doubt has some effect on Red Bull's business however calculating that figure is a complex procedure." *Id.* at 5. The Report then moves through four phases of analysis, none of which provides scientific or empirical support for the existence of such an effect on business or contributes to an actual calculation of that figure.

First, the Report provides general assertions about how branding works. It notes that the purpose of branding is to create a perception of differentiation that justifies a higher price/value for a commodity, and that brands are created by enterprises with the goal of shaping perception. *Id.* at 7-9. This information might be relevant if we had any concrete evidence of what consumers' perceptions of the Red Bull brand *actually were*. As the Report itself states, "Branding is not advertising." *Id.* at 7. Whether and how Red Bull successfully justified a "higher price/value" through its advertisements therefore turns, by Mr. Frankel's own analysis, on how Red Bull's advertising *was perceived*. In this portion of the analysis the Report also lists six "elements" of brand (trust, size, credibility, stability, authority, and consistency), but provides no empirical evidence of which, if any, drove Red Bull's market advantage. *Id.* at 10. This question is crucial to the purpose for which the report is offered: to show that Red Bull's profits will be affected by the specific labeling changes secured by this Settlement. If, for example, it turned out that Red Bull's perceived brand was mostly driven by its size then these labeling changes would have no effect on it. Where, as here, a report is based on data and methodology that are "simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (internal quotation omitted).

Next, the Report qualitatively describes aspects of Red Bull's brand identity that might contribute to positive perceptions and therefore drive sales. These aspects include its perceived "creation" of the energy drink category, *id.* at 12, and the fact that:

> Red Bull maintains an organization rivaling any news media that creates content to attract its users that, due to modern media and technologies, does not resemble a traditional advertising model. Red Bull focuses on creating graphic textual video, audio and event content more as a sponsor/publisher, as if it were the creator of the *extreme lifestyle*, a factor embraced by its core target market. In doing so, Red Bull engineers its content to feature excitement, daring, risk, adventure and sporting challenges in which its product seems a natural fit. *Id.* at 12.

This information about the extreme lifestyle marketed by Red Bull is irrelevant to the proposition that Defendants' removal of "health claims" from their advertising "no doubt has some effect on Red Bull's business." Much less does the description tell the reader how that effect should be quantified. Indeed, it actually *supports* Frank's position in his objection that, far from relying on Red Bull's "health claims," some consumers "may have purchased it because they thought Red Bull Flugtag was cool." Objection of Theodore H. Frank, Dkt. 81 at 23. This section ends with the conclusory statement that, after these elaborate marketing efforts have gotten users into stores, "consumers review the differences among competitive brands in search of reasons to pay almost twice the price for Red Bull as they would for competitive product. It is at this juncture Red Bull's clinical claims add value to its product and justify the consumer's purchase." Frankel Report at 12. Mr. Frankel makes no effort to determine what consumers' actual perceptions of Red Bull's health claims were or what percentage of purchasing decisions can be attributed to them. The argument that the relabeling at issue in this case has affected Red Bull's market share depends entirely upon knowing these things, and without them this Report amounts to non-scientific speculation.

In Section Seven Mr. Frankel conducts his third phase of analysis, and the only one in which he performs any empirical calculations (or, as the Report puts it, "produce[s] a tangible, data-driven

number.") *Id.* at 14. Unfortunately, the data-driven numbers it generates are almost confusingly irrelevant to the purpose for which the Report is offered. The stated purpose of this particular section is to calculate Red Bull's "brand-derived profit." Mr. Frankel restates the empirical fact that Red Bull leads its competitors with a minimum 43% market share, despite being twice as expensive. He then provides some quasi-quantitative analysis suggesting that while Red Bull's marketing efforts are ostensibly aimed at young men between ages 18 and 24, "a more accurate lifetime of brand usage would start at 18 and end by age 38, when health concerns begin to take a higher priority." *Id.* at 15. In the most generous light, this theory suggests that *some* of Red Bull's customers *might* be in a demographic more concerned with health claims than its target demographic. But it provides no information whatsoever about how they translate into an effect on Red Bull's business (even assuming, again generously, that such an effect forms the proper basis for determining the value of the injunctive relief in the first place). Does this imply, for example, that Red Bull's younger, target demographic cares *little* about health claims?

After spending seven of eight substantive sections on this conclusory and unsupported analysis, Mr. Frankel finally attempts to answer the actual question of valuation. He does so by largely ignoring everything else he has said and focusing on three highly inapplicable case studies. From the 1982 episode of Tylenol's cyanide sabotage (resulting in seven casualties) and the 2000 episode of Firestone's faulty tires (resulting in 270 casualties) Mr. Frankel concludes that "once a user places trust in the brand, he is shaken by any accusation, rumor or factual evidence that might throw doubt into his purchase decision." *Id.* at 17. The conclusion that these high-profile cases of mass fatality shed any light on consumers' reaction to Red Bull's relabeling does not pass the straight face test, much less the *Kumho* test. *See Great Am. Ins. Co. v. Summit Exterior Works, LLC*, No. 3:10 CV 1669 (JGM), 2012 U.S. Dist. LEXIS 17548, at *20 (D. Conn. Feb. 13, 2012) ("The Second Circuit similarly has ruled that 'expert testimony should be excluded if it is speculative or conjectural, or it if is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison.'") (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73

F.3d 18, 21 (2d Cir. 1996)). Finally, Mr. Frankel reveals how he arrived at the specific 1.4% number promised at the start of the report: he imports it directly from another unrelated case study, in which Taco Bell suffered that percentage loss of annual revenue following an (eventually dismissed) class action claiming that "what Taco Bell calls 'seasoned beef' is a meat mixture that has binders and extenders and does not meet federal requirements to be labeled beef." *Id.* at 22. Any lay witness could speculate or intuit about the (dubious) applicability of a revenue loss in an isolated case of viscerally disgusting allegations about food product to the instant case. However, the magicking up of this figure—which appears to be the only substantive reason the Frankel Report is even theoretically relevant to counsel's Fee Motion—is not the product of expert analysis, and certainly not of the particular conclusory, non-empirical analysis in the seven sections that preceded it.

Beyond its violation of the principles of *Daubert* and *Kumho*, the Frankel Report should be excluded from evidence because it is unsworn hearsay under Fed. R. Evid. 802 and improperly authenticated under Fed. R. Evid. 901(a). If an expert report is offered in lieu of testimony, the statements in the report are hearsay falling under no exception to the hearsay rule. *See Ake v. General Motors Corp.*, 942 F.Supp. 869, 877-78 (W.D.N.Y. 1996); *Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2002 U.S. Dist. Lexis 7535, *19-20 (S.D.N.Y. 2003). True, if the proponent of hearsay evidence in the analogous context of a summary judgment hearing can demonstrate that it would be possible to introduce the content or substance of the material at trial, the court may take into account the material in deciding the motion. *See, e.g., Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("[a]t the summary-judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."). Nonetheless, even in these circumstances, for the purposes of authentication under Fed. R. Evid. 901(a) an expert report cannot be transmitted into evidence without an affidavit attesting to its truthfulness. *See, e.g., Brown v. Thomas*, 771 F.3d 1001, 1006 (7th Cir. 2014); *Scott v. Edinburg*, 346 F.3d 752 (7th Cir. 2003). Class counsel provide no such affidavit from Frankel. Finally, the Frankel Report violates the requirement of Rule 26 of the Federal Rules of Civil Procedure governing expert witnesses, which requires that

expert witnesses submit a written report including "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition," Fed. R. Civ. P. 26(2)(B)(v), and "a statement of the compensation to be paid for the study and testimony in the case," Fed. R. Civ. P. 26(2)(B)(vi).[1] The Frankel Report contains neither. These violations constitute further grounds upon which the Frankel Report should be excluded.

## CONCLUSION

Like the tire testimony at issue in *Kumho*, Mr. Frankel's Report fails on its own grounds. If the value of brand identity is based, as he suggests, on consumer perception, its fluctuations cannot be measured without any kind of reference to actual consumer perception. And they certainly cannot be measured solely by reference to the perceptions of another brand's consumers in a single case involving a wholly different—and far more repulsive—set of factual circumstances. We move that the Frankel Report be excluded from the record.

Dated: April 22, 2015

Respectfully Submitted,

*/s/ Erin Sheley*

Erin Sheley
Center for Class Action Fairness
1718 M Street NW, No. 236
Washington, DC 20036
Phone: (617)308-1215
Email: erin.sheley@gmail.com
Attorney for Objector Theodore H. Frank

---

[1] While a fairness hearing is not, of course, a full trial on the merits, it is nonetheless an adversarial proceeding and should be bound by the same formalities designed to secure fairness for all parties. *See Mars Steel Corporation v. Continental Bank N.A.*, 880 F.2d 928, 938 (7th Cir. 1989) (holding that the Federal Rules of Evidence apply); *Dumont v. Charles Schwab & Co.*, 2000 U.S. Dist. LEXIS 10906, at *27 (E.D. La. July 21, 2000) (same); *cf. also Redman v. Radioshack Corp.*, 768 F.3d 622, 638 (7th Cir. 2014) (criticizing irregular procedure that deprives objectors of necessary information); *see generally Amchem Prods. v. Windsor*, 521 U.S. 591, 621 (1997) (noting the "benefit of adversarial investigation" in vetting class action settlements).

## Certificate of Service

The undersigned certifies she filed the foregoing Motion on ECF which will send electronic notification to all attorneys registered for ECF-filing.

Dated: April 22, 2015

/s/ *Erin Sheley*

Erin Sheley